**UNIVERSITY OF PITTSBURGH, a non profit corporation, Appellant,**

v.

**CHAMPION PRODUCTS INC., a corporation.**

No. 82–5081.

United States Court of Appeals, Third Circuit.

Argued July 7, 1982.

Decided Aug. 12, 1982.

Certiorari Denied Dec. 13, 1982.

See 103 S.Ct. 571.

Walter J. Blenko, Jr. (argued), Arnold B. Silverman, Lynn J. Alstadt, Buell, Blenko, Ziesenheim & Beck, Pittsburgh, Pa., for appellant.

Paul J. Weiner, Adrian V. White, Breed, Abbott & Morgan, New York City, and Anderson, Moreland & Bush, Pittsburgh, Pa., for appellee; William H. Hauser, Pittsburgh, Pa., of counsel.

Before SEITZ, Chief Judge, and VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

This is an appeal from a final order of the district court, sitting without a jury, entering judgment for the defendant based upon a finding that the plaintiff's trademark infringement and unfair competition claims are barred by laches. *University of Pittsburgh v. Champion Products, Inc.*, 529 F.Supp. 464, 469 (W.D.Pa.1982). This court has jurisdiction under 28 U.S.C. § 1291 (1976).

Because we believe that the district court erred in applying the doctrine of laches to bar plaintiff's claims for prospective injunctive relief, we will reverse that portion of the judgment and remand for further consideration of the facts and law underlying plaintiff's claim for future injunctive relief. *See, e.g., In re Arthur Treacher's Franchisee Litigation, Arthur Treacher's Fish & Chips, Inc. v. A & B Management Corp., etc.*, 689 F.2d 1137 (3d Cir. 1982). In all other respects, the judgment of the district court will be affirmed.

### I.

The historical facts of this case are set forth in detail in the district court's opinion. *See* 529 F.Supp. at 466–67. The University of Pittsburgh ("Pitt") is a non-profit Pennsylvania corporation, originally established in 1787, which has been operating under its

present name since 1908.[1] Shortly thereafter, Pitt adopted the panther as the mascot for its athletic teams. Since that time, Pitt has come to enjoy a widespread reputation for the excellence of its undergraduate, graduate and professional schools and, more recently, for its national calibre athletic programs. As a result, "University of Pittsburgh," "Pitt," "Panthers," and "Pitt Panthers" have become largely synonymous in the public mind. As the district court found, the names "University of Pittsburgh" and "Pitt" have been used by Pitt on its athletic uniforms for over 50 years. 529 F.Supp. at 466. Further, at least since World War II, the Pitt bookstore has sold an array of clothing and novelty items bearing these names and various representations of the University seal and panther mascot. Id.[2]

Champion Products, Inc. ("Champion") is a New York corporation engaged in the business of manufacturing and marketing "soft goods,"[3] approximately 80% of which are imprinted with the names and/or symbols of schools, colleges, universities, and other entities or events. N.T. at 547, reprinted at 530a. It is largely undisputed that Champion created and nurtured the imprinted soft goods industry[4] and is now the premier manufacturer in the field with annual sales in excess of $100 million. Id. By Champion's own testimony, the names or insignia of more than 10,000 schools, colleges and universities appear on Champion goods. Champion has developed this business to a point where it employs over 100 salesmen, maintains an extensive art department to update old designs and develop new ones, and spends in excess of $800,000. annually to advertise its products. N.T. at 547–53, reprinted at 530a–36a. There has been no allegation that Champion's goods are not of the highest quality. Champion does not now, and apparently never has, maintained any licensing arrangement with, or paid royalties to, any of the schools or colleges whose insignia it uses. N.T. at 548–49, reprinted at 531a–32a.[5]

Although the testimony was not without confusion,[6] the district court found that the

---

1. From 1787 until 1908, the institution was known as the Western University of Pennsylvania.

2. District court findings 7 and 20 on pp. 466 & 468, respectively, of 529 F.Supp. include this wording:

   "7. ... In 1980, Pitt applied for and received certificates of registration for some twenty-seven of its insignia with the Commonwealth of Pennsylvania. In 1961, 1971 and 1981, it obtained Pennsylvania registration for its rings and in 1981, for other jewelry. In 1980, it also made six applications to the United States Patent and Trademark Office for various of its insignia.

   *   *   *   *   *   *

   "20. Prior to December, 1980 Pitt never objected to Champion's selling soft goods bearing Pitt insignia. In June, 1981 Pitt asked Champion to execute a license agreement requiring Champion to pay a $100 license fee and a 6% royalty on sales of soft goods bearing Pitt insignia. Champion refused."

3. The district court stated:
   "For purposes of these findings of fact and conclusions of law the term 'soft goods' includes T-shirts, sweat suits, polo shirts, jackets and other wearing apparel. It does not include banners, pennants, lab coats or lab smocks, aprons or neckties."

529 F.Supp. at 467.

4. In 1933 or 1934, Champion developed and patented a new process for applying imprints and designs that replaced the former method, which had been substantially more expensive and time consuming, and involved the cutting out of cloth and hand-sewing individual letters or insignia pieces to the garment. 529 F.Supp. at 466. For a description of the current process, see note 23 below.

5. The record discloses that Champion pays royalties for the use of National Football League trademarks, N.T. at 602, reprinted at 578a; the "Snoopy" comic strip character, N.T. at 598, reprinted at 574a; and perhaps other marks as well. Also, there has been litigation involving Champion's right to use marks related to the annual Rose Bowl game. Br. for appellant at 28.

6. Virtually all the testimony of the Pitt/Champion relationship prior to 1960 came from Sam Friedland, who was Champion's salesman in the Pittsburgh area from 1936 until 1968. The district court explicitly credited his testimony. 529 F.Supp. at 467. We point out that Mr. Friedland's recollection is understandably vague in some particulars.

relationship between Pitt and Champion began in 1936 when Champion began supplying Pitt with athletic uniforms bearing Pitt's name and marks. At approximately the same time, Pitt began carrying Champion-made Pitt soft goods in the campus bookstore. 529 F.Supp. at 467. This arrangement continued until 1960.[7] During the same period, Champion apparently also sold goods with the Pitt marks to others in the Pittsburgh area not affiliated with the University. *Id.* Since 1946, Champion sold such goods to Shea's Sporting Goods store in Pittsburgh, a business not affiliated with the University, which in turn resold the goods to the general public. Pitt maintains that Shea's had an informal license agreement with the University to sell insignia goods to campus organizations but that Pitt had no knowledge of and never approved any other distribution of Pitt insignia goods. The question of knowledge aside, however, Pitt never objected to any action taken by Champion until the early stages of this litigation.

The mid-1970s marked a period of dramatic success and increased national exposure for the Pitt football team.[8] Following the 1976 football season, the Pitt team was invited to play the University of Georgia for the unofficial national championship[9] at the 1977 Sugar Bowl game in New Orleans. Upon returning from that game, the manager of Pitt's campus bookstore reported to her superiors that literally thousands of garments bearing various Pitt insignia were in evidence at the game. This report engendered discussions of the issue among university officials and culminated in a decision to register its name and marks under federal and state trademark laws and license their use by manufacturers. N.T. at 269–71, *reprinted at* 302a–04a.[10] On August 4, 1980, Pennsylvania trademark registrations were issued to Pitt covering 29 marks or combinations, including eight for use on clothing.[11] On December 18, 1980, Pitt contacted Champion, gave notice of its claim to the marks, and requested that Champion execute a license agreement.[12] Champion refused.

On December 2, 1981, Pitt brought this action in state court, alleging (1) common law trademark infringement; (2) trademark infringement in violation of Pa.Stat. Ann. tit. 73, § 23 (Purdon 1971); (3) common law unfair competition; and (4) false designation of origin of goods under the Lanham Act, 15 U.S.C. § 1125(a) (1976). Champion removed the case the next day to the United States District Court for the Western District of Pennsylvania.[13] On De-

---

7. In 1960, Pitt ceased carrying most of this type of goods in the bookstore. Such items are now available to order. 529 F.Supp. at 467.

8. In the early 1970s, Pitt hired Johnny Majors, a well-known college coach, in an effort to bring its football program up to national championship level and to compete directly with in-state rival Penn State. Largely through an aggressive recruiting program, Majors soon built such a team around several All-American players—notably running back Tony Dorsett, the 1977 Heisman Trophy winner. Dorsett now plays professionally for the Dallas Cowboys, while Majors now coaches at the University of Tennessee.

9. There is no NCAA sanctioned championship in football as there is in other sports. Rather, teams vie for positions in polls operated by the major wire services in which coaches and sportswriters select the top team. This game was recognized as the national championship for the 1976 college football season.

10. As early as 1961, Pitt had registered the design of its class ring under the Pennsylvania

trademark law. 639a. Since then, Pitt has consistently licensed the jewelers who produce the rings. N.T. at 646–47, *reprinted at* 618a–19a.

11. *See* Pa.Stat.Ann. tit. 73, § 16 (Purdon 1971). Under Pennsylvania law, trademark registration is a ministerial act upon compliance with the application requirements. There is no provision for opposition except in a subsequent enforcement proceeding. *Id.* §§ 16, 17 & 20.

 Pitt has also filed several federal trademark registrations. All of those which are relevant here are still pending.

12. Pitt's proposed terms include an annual fee of $100. plus a royalty of 6% of all sales of Pitt-marked products. *See* plaintiff's ex. 5, *reprinted at* 656a–61a.

13. *See* 28 U.S.C. § 1441 (1976). The district court had federal question jurisdiction over the Lanham Act claim and pendent jurisdiction over the related state law claims. The district court also had independent diversity jurisdiction over the state claims.

cember 4, 1981, after a hearing, the court denied Pitt's request for a preliminary injunction. A bench trial on the issue of liability was held on December 10–11 and 14–17, 1981, and on January 7, 1982, the district court filed its findings of fact and conclusions of law holding the plaintiff's claims to be barred by laches. Pitt's motion to make additional findings of fact and amended conclusions of law was denied on January 18, 1982.

This appeal followed.

## II.

The issue before this court—and the only issue discussed in the district court's opinion—is very narrow: has Champion carried its burden of establishing on these facts the affirmative defense of laches to a degree which must bar Pitt's claims in their entirety? Because laches is an equitable doctrine, its application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits relevant to a prospective injunction. Consequently, while we must of necessity discuss the merits of the plaintiff's claim, we express no opinion on the ultimate question of precisely what has been proven on this record, nor on the availability or scope of the prospective injunctive remedy available, preferring not to venture into this expanding area of the law without the benefit of the district court's findings and conclusions on the issues raised by the application for such a prospective injunction.

### A. The Doctrine of Laches

■ It is hornbook law that laches consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay. *Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1258 (3d Cir. 1974); *Sobosle v. United States Steel Corp.,* 359 F.2d 7, 12–13 (3d Cir. 1976).[14] Pennsylvania and

federal law in this field are identical for all practical purposes. *Anheuser-Busch v. Du Bois Brewing Co.,* 175 F.2d 370, 373–74 (3d Cir. 1949), *cert. denied,* 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1354 (1950); *Artus Corp. v. Nordic Co.,* 512 F.Supp. 1184, 1187 (W.D. Pa.1981); *Consolidated Home Specialties v. Plotkin,* 358 Pa. 14, 30, 55 A.2d 404, 412 (1947).

■ Although there is some degree of confusion on this point in the older cases, it is also clear that actual "laches" in effect works an equitable estoppel barring all relief and requires a showing of both delay and prejudice. *Jenn-Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48, 49–50 (3d Cir. 1972), *quoting Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); *Sobosle v. United States Steel Corp.,* 359 F.2d at 12. In the trademark context, the concepts of "mere delay" or "laches without more," although confusing as a matter of semantics, *see Alfred Dunhill of London v. Kasser Dist. Prod. Corp.,* 350 F.Supp. 1341, 1364–65 (E.D.Pa.1972), *aff'd mem.,* 480 F.2d 917 (3d Cir. 1973), are nonetheless relevant in two ways.

First, there is that narrow class of cases where the plaintiff's delay has been so outrageous, unreasonable and inexcusable as to constitute a virtual abandonment of its right. In *Anheuser-Busch v. Du Bois Brewing Co.,* for example, we postulated that, "for example, had there been a lapse of a hundred years or more, we think it highly dubious that any court of equity would grant injunctive relief against even a fraudulent infringer." 175 F.2d at 374. Second, there is the much more common situation in which the plaintiff's less egregious delay will bar its claim for an accounting for past infringement but not for prospective injunctive relief. *Id.* at 373–74 (citing cases); *Alfred Dunhill of London v. Kasser Dist. Prod. Corp.,* 350 F.Supp. at 1364; 4 R. Callman, *Unfair Com-*

14. The two additional elements mentioned by the district court are subsumed by delay and prejudice. *See* 529 F.Supp. at 469. Open and notorious use by the defendant is relevant to the plaintiff's knowledge and, thus, whether its delay is excusable. Evidence of the defend-
ant's fraudulent intent goes to the question of whether "prejudice" has been established as a matter of equity. *See, e.g., Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 427 (E.D.Pa.1980).

*petition* § 87.3(b), at 126 (3d ed. 1970). The distinction between these classes of cases and between mere delay and the laches which give rise to affirmative rights in the defendant as a result of detrimental reliance, has been consistently recognized by the Supreme Court for well over 100 years. *Menendez v. Holt*, 128 U.S. 514, 523–24, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888); *McLean v. Fleming*, 96 U.S. 245, 257–58, 24 L.Ed. 828 (1877). As the Court explained in *Menendez*, where there is delay but not detrimental reliance, the infringer is in effect operating with the consent of the trademark owner and "[w]here consent by the owner is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.'" 128 U.S. at 524, 9 S.Ct. at 145 (citing cases).[15]

The length of the plaintiff's delay is also relevant for one other reason. Our recent cases have held that where the "plaintiff sleeps on his rights for a period of time greater than the applicable statute of limitations," the burden of proof shifts to the plaintiff to prove the absence of such prejudice to the defendant as would bar all relief. *Gruca v. United States Steel Corp.*, 495 F.2d at 1258–59; *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949 (3d Cir. 1971).

Finally, we note again that laches is an equitable doctrine addressed to the sound discretion of the district judge, whose determination we will not disturb absent an abuse of that discretion. *Gruca v. United States Steel Corp.*, 495 F.2d at 1258.

B. *Pitt's Delay in Asserting Its Claim*

■ At the outset, it cannot be said on these facts that the district court abused its discretion in barring Pitt's claim for an accounting for past infringement. At least as to the period after 1960, when Pitt stopped carrying imprinted goods in its bookstore, we agree with the district court

that "[i]t is inconceivable that persons in authority at Pitt did not know that Champion soft goods, marked with various Pitt insignia, were being sold at retail outlets other than the Pitt book store." 529 F.Supp. at 468. The evidence that Pitt-imprinted garments were widely worn by students and faculty and readily available in the community is more than sufficient to support such a conclusion. Insofar as earlier periods are concerned, the evidence is less certain but it cannot be said that the district court's findings that Champion was selling to persons other than Pitt are clearly erroneous. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, —— U.S. ——, ——, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). At best, this evidences inattention on Pitt's part; at worst it represents precisely the sort of silent acquiescence which the courts since *McLean* and *Menendez* have held sufficient to bar an accounting.

■ However, we do not believe that Pitt's action rises to the level of outrageous and inexcusable delay which will bar all relief even absent a showing of detriment to Champion. Neither do we understand the district court to have believed this to be the case.

Read in the light most favorable to Champion, the district court's findings show that Champion, with Pitt's actual or chargeable knowledge, sold Pitt-marked goods in the Pittsburgh area during the same period that it was selling to the Pitt bookstore and thereafter. Pitt's witnesses testified that, to the extent that the university was aware of outside sales, they believed that most of them were made to students or others as to which Pitt had no objection. There is no indication that Pitt "abandoned" its name or marks in the sense of non-use or "a general surrender of the use to the public." *Menendez v. Holt*, 128 U.S. at 524, 9 S.Ct. at 145. In fact, during this same period, Pitt

---

**15.** It is sufficient to note in passing that the *Menendez* Court's comment that "the intentional use of another's trademark is a fraud" was made in the context of this discussion.

128 U.S. at 523, 9 S.Ct. at 145. Thus, to the extent that Pitt employs this language in support of its argument for an accounting, it does so out of context and, we hold, unsuccessfully.

went to the trouble of registering a trademark in the design for its class ring.[16]

Similarly, the district court did not find that Pitt officials had any knowledge of the existence or volume of sales outside of the Pittsburgh area before the 1977 Sugar Bowl game.[17] Pitt could well have felt that, so long as sales were largely confined to the Pittsburgh area, it would be likely that the university would become aware of quality problems or objectionable uses in due course and that the costs of litigation and damage to its ongoing business relationship with Champion made the volume of the infringement involved *de minimus.* This action was certainly the sort of silent acquiescence which would bar an accounting for that period, but cannot be said to be so unreasonable as to cut off all rights. These facts differ substantially from those in *Anheuser-Busch,* a case relied upon heavily by Champion, where the senior user of the trademark, with full knowledge of the infringement of the junior user, initially brought an infringement action and then abandoned it and made no further objection for 40 years. *See* 175 F.2d at 372–74. Here, the character and scope of the alleged infringement changed substantially over the years from a modest program of sales to students and local adherents of the university to a program of national sales aimed at servicing and capitalizing upon Pitt's emergence as a national college football power. While Pitt may have acquiesced in the former, it promptly objected to the latter. Thus, to the extent that any of the traditional trademark cases are apposite,[18] this case is less analogous to *Anheuser-Busch* than to *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir. 1978), where the plaintiff objected to the defendant's long-standing, although admittedly junior, use of the name "Scott's" only after the defendant, whose marketing efforts had previously been limited to the greater Denver area, made a public offering of its stock and began nationwide advertising and marketing efforts. *Id.* at 1227–28.

■ Consequently, we reject Champion's contention that Pitt's delay alone has barred its right to prospective relief and hold that such a bar must depend upon the degree to which Pitt's delay may have prejudiced Champion.

## C. *Detrimental Reliance By Champion*

Although the district court made four separate findings of fact concerning Champion's reliance on Pitt's inaction,[19] Champi-

16. *See* note 10 above.

17. Champion presented testimony on this point, but the court made no findings. The gist of Champion's argument is that Pitt-marked goods were advertised in catalogs distributed nationwide so that Pitt, whose bookstore received the catalog, was on notice of the scope of Champion's sales.

18. As we will discuss below, this case falls within a new and expanding area of the law in which the principles transferrable from the older cases are somewhat unsettled.

19. The court found:
"25. Champion has borne the risk of building the insignia soft goods business. Through the years, Champion's salesmen have called on and tried to enlist drugstores, men's wear stores, variety stores and book stores as outlets for its soft wear.
"26. Champion maintains quality control on the goods that it manufactures and distributes, with respect to both the materials involved and the imprinting process.

"27. Champion has an extensive creative art department for the development of graphics and designs that are used to respond to competitive pressures for new fashion requirements. Champion artists have developed the designs over the years and are constantly modifying them to meet consumer demands.
    \*     \*     \*     \*     \*     \*
"30. Champion has built up substantial goodwill in the business of selling soft goods bearing college or university insignia. Champion has a sales force of between 100 and 125 salesmen who serve more than 10,000 accounts."
529 F.Supp. at 468. At the outset, we note that we do not believe Champion's quality control efforts to be evidence of detriment. Thus, our discussion will focus on the remaining points. As noted at the end of part II–A above, our decision in *Gruca* may shift the burden of justifying the delay and/or disproving prejudice to Pitt as a result of the length of the delay. 495 F.2d at 1258–59. Regardless of the allocation of this burden, we conclude as a matter of law that the evidence in this record does not sup-

on's position may be stated succinctly: "Champion created, developed and expanded the imprinted soft-goods industry with the full knowledge of Pitt who should not now be permitted to profit from the markets developed by Champion." While this argument is rhetorically attractive, we do not believe that this case is nearly so simple.

In the classic trademark or unfair competition case, both parties manufacture and/or sell the same or related products. When both attempt to use the same name or trademark, the law protects the senior user from what is, in laymen's terms, an attempt by the junior user to take advantage of the market demand and goodwill generated by the senior user. The essential issue is consumer confusion: if the public could reasonably believe the junior's product to be the product of the senior, the junior may be enjoined. Laches becomes relevant where the senior delays in asserting its rights for so long that the junior has developed sufficient demand and goodwill through its own efforts that it would be inequitable to enforce the senior's rights. These principles, which we have stated here in summary fashion, are discussed in detail in our earlier cases, as well as in a helpful opinion by our colleague, Judge Becker, then of the district court, in *Alfred Dunhill of London v. Kasser Dist. Prod. Corp.*, 350 F.Supp. at 1357–58.

In this case, there is no consumer confusion in the traditional sense. No one would seriously assert that a significant segment of the public believes that Pitt actually manufactured the goods involved. This is the heart of Champion's argument on the merits and the theoretical basis for their laches position. Further, Champion argues, "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait and see how successful his competitor will be and then destroy with the aid of a court decree much of what

the competitor has striven for and accomplished...." *Anheuser-Busch v. Du Bois Brewing Co.*, 175 F.2d at 375 (citing cases).

It is, however, equally beyond question that, while the market for imprinted soft goods, in the sense of their physical availability to the public and the public's corresponding knowledge of that availability, exists as a result of Champion's efforts, the ultimate demand for the product is a direct result of the efforts of Pitt to make its name widely known through athletic and educational accomplishments. With negligible exception,[20] a consumer does not desire a "Champion" T-shirt, he (or she) desires a "Pitt" T-shirt. The entire impetus for the sale is the consumer's desire to identify with Pitt or, perhaps more realistically, with Pitt's successful athletic programs. From this point of view, then, it is Champion which seeks to profit from Pitt's investment, particularly in its athletic program. This formulation of the issue reflects a growing and unsettled aspect of the law of unfair competition both at common law and under the Lanham Act.

The landmark case in this area is the Fifth Circuit's decision in *Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), where the court explained:

"In this case, however, the district court overlooked the fact that the act was amended to eliminate the source of origin as being the only focal point of confusion. The confusion question here is conceptually difficult. It can be said that the public buyer *knew* that the emblems portrayed the teams' symbols. Thus, it can be argued, the buyer is not confused or deceived. This argument misplaces the purpose of the confusion requirement. The confusion or deceit requirement is met by the fact that the defendant duplicated the protected trademarks and sold

---

port a finding of prejudice sufficient to support the laches determination.

**20.** It may be that a few particularly astute consumers value the quality of a Champion

garment, regardless of imprint, over the association with the imprint gained by wearing it. We doubt it.

them to the public knowing that the public would identify them as being the teams' trademarks. The certain knowledge of the buyer that the source and origin of the trademark symbols were in plaintiffs satisfies the requirement of the act. The argument that confusion must be as to the source of the manufacture of the emblem itself is unpersuasive, where the trademark, originated by the team, is the triggering mechanism for the sale of the emblem."

In *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 658–59 (W.D.Wash.1982), the district court elaborated on this point and described the problem as a "confusion of sponsorship"[21] in cases where the junior user's purpose is "to capitalize on the market of those people who want to associate themselves with an NFL team." This formulation, according to the court, recognizes the "symmetry between the concepts of secondary meaning and likelihood of confusion." *Id.* at 659. The Seventh Circuit has recently taken a similar position in *Processed Plastic Co. v. Warner Communications*, 675 F.2d 852, 856–58 (7th Cir. 1982). However, the precise contours of this theory are by no means settled, as evidenced by the Fifth Circuit's apparent retreat from some of the broader language in *Boston Hockey*, *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676

F.2d 1079, 1084 & n.7 (5th Cir. 1982); and the Ninth Circuit's rejection of *Boston Hockey* almost in its entirety, *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th Cir. 1981).[22]

We decline to delve into this fray without the benefit of its consideration by the district court and full briefing of these most recent cases by the parties. Nonetheless, even postulating a less expansive variation of this theory than that expressed in *Boston Hockey*, we believe that the fundamental concepts upon which these cases rest require a reevaluation of the district court's findings concerning Champion's reliance on Pitt's delay.

First, it is simply not true that Champion has built up its entire business in reliance on Pitt's inaction. By Champion's own testimony, Pitt is only one of approximately 10,000 schools and colleges whose names or designs they imprint on soft goods. Champion built its physical plant, art department and sales force in order to design, produce and market soft goods with marks and designs of every kind. Some of these designs—notably those of professional football teams—it pays for; others—apparently schools and colleges—it does not. The only tangible investments in Pitt's designs, per se, are the screen stencils used for imprinting the designs—which are produced in quantity, used for no more than a few dozen shirts, and then destroyed[23]—and the

21. A similar analysis was applied by the Second Circuit in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979). In that case, the court upheld an injunction barring distribution of an "adult" film in which the leading character was dressed—if that term is appropriate—in a representation of the plaintiff's uniform.

22. Apparently, the Ninth Circuit has not yet had the opportunity to consider a possible conflict between its decision in *Rainbow Girls* and the more recent decision of the district court in *NFL Properties*.

23. As the district court explained:
"10. Champion's patented method involved a silk screen process used to apply designs and letters to its soft goods. A screen of silk or synthetic material is stretched on a frame. The screen then is coated with a photosensitive material. Next,

a transparent sheet called a 'brunning,' having the desired design printed thereon, is taped to the screen. Light is shown through the transparency onto the screen exposing part of the photosensitive material that blanks off the screen. The unexposed material is washed off leaving openings through which paint or an adhesive may be forced. The paint can pass through only the portion of the screen that corresponds on the transparency. The screen is placed over a shirt and paint is forced through the screen with a squeegee. After the screen is removed the shirt carries the design applied on it. Then the paint is cured, and the process is completed.
"11. Champion does not reuse its screens. Three or four dozen shirts can be made from one screen. Additional screens are made for larger orders. When an order is completed, the screen is destroyed. Champion makes 2,000 to 2,500 screens per day."

time and effort of the art department in developing new variations—presumably color, arrangement and lettering style—of the name, seal and mascot of Pitt. In other words, Champion developed its physical plant in reliance, not on Pitt, but on its own ability to develop and market such imprinted goods that the public, for whatever reason, wishes to buy. With this capability in place, Champion can seize upon the popularity of anyone or anything—popularity which is entirely unrelated to any effort by Champion—and produce the appropriate soft goods. Thus, this case is very different from those in which the junior user has developed its entire business around one name or product which the senior user then seeks to prohibit it from using or producing. *See Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 429–30 (E.D.Pa.1980).

Similarly, Champion has indeed developed a market in the sense of recruiting sales outlets, but again Champion was seeking outlets and developing goodwill for whatever Champion products were in demand in that area. The fact that greater Pittsburgh sales outlets were interested in Pitt-marked goods is not so much a result of Champion's efforts as understandable local loyalty. As to buyers outside the area, the evidence appears to show that consumer demand increased in direct proportion to Pitt's football fortunes. If a potential Pitt goods customer indicated that it would prefer to stock Penn State or Princeton or Duke imprinted goods, for example, there is no evidence that Champion would feel compelled to push Pitt-marked products. While Champion has indeed developed the mechanism for producing and marketing these goods, the demand for goods with any given imprint is due not to the efforts of Champion but rather to the efforts of the school, team, movie producer, musical group, or whatever person or entity whose imprint is used and whose current popularity makes that imprint desirable.

529 F.Supp. at 467.

**24.** As we noted at the outset, we read the district court opinion as deciding only the laches issue. To the extent that Champion raised other defenses which were not decided by the

The teaching of *Boston Hockey, NFL Properties,* and related cases is that, whatever the ultimate scope of protection afforded, the crucial element is consumer desire to associate with the entity whose imprint is reproduced. This desire is based on success or notoriety which, in turn, is a result of the efforts of that entity. Champion merely packages and exploits it. Champion's investment is in the industry in general, not in Pitt's marks in particular. We doubt that if Pitt closed its doors tomorrow—or, perhaps more to the point, discontinued football—Champion's losses would extend beyond existing inventory. This we hold to be insufficient to bar all relief.

### III.

For the foregoing reasons, the judgment of the district court will be reversed insofar as it holds Pitt's claims for prospective injunctive relief to be barred by laches, and the case will be remanded for further proceedings concerning the scope of prospective injunctive relief, if any, and for such findings and conclusions as the district court may make on that subject, consistent with this opinion and such further evidence as may be produced on remand. We decline to determine on the present record the precise scope of prospective injunctive relief available in light of the developing case law in this area and its application to the relevant facts underlying this case as they may be supplemented on remand.[24]

In all other respects, the judgment of the district court will be affirmed.

The parties will bear their own costs.

district court, they remain open for consideration on remand. Similarly, because the proceedings below were bifurcated, there has not yet been a trial on the terms or scope of relief, if any, which should issue.