**UNIVERSITY OF PITTSBURGH, a non-profit corporation, Plaintiff,**

v.

**CHAMPION PRODUCTS, INC., a corporation, Defendant.**

**Civ. A. No. 81–2167.**

United States District Court,
W. D. Pennsylvania.

Jan. 7, 1982.

Walter Blenko, Buell and Blenko, Pittsburgh, Pa., for plaintiff.

William H. Hauser, Anderson, Moreland & Bush, Pittsburgh, Pa., Paul J. Weiner, Breed, Abbott & Morgan, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COHILL, District Judge.

### I.

#### Preliminary Statement

Plaintiff, University of Pittsburgh, seeks an injunction to prohibit the defendant, Champion Products, Inc., from marketing clothing, more particularly, "T-shirts," sweatshirts, jackets, and other wearing apparel known in the trade as "soft goods," decorated with the words "University of Pittsburgh," "Pitt" and various other words, emblems and artwork related to the University. Plaintiff also seeks an accounting for the defendant's past sales of Pitt insignia goods.

Following a hearing on December 4, 1981, we denied plaintiff's motion for a preliminary injunction. At the request of the parties, we accelerated the time for a hearing on plaintiff's request for a permanent injunction and other related relief. By stipulation the trial was bifurcated and the Court heard testimony only on the merits of the request for injunctive relief.

Now, in accordance with Rule 52 of the Federal Rules of Civil Procedure, we make the following findings of fact and conclusions of law.

## II.

### Findings of Fact

#### a. The Parties.

1. Plaintiff, the University of Pittsburgh ("Pitt"), is a non-profit Pennsylvania corporation having an office at 3209 Cathedral of Learning, Pittsburgh, Pennsylvania 15260. Pitt was established as an institution of higher learning in 1787, and changed its name from Western University of Pennsylvania to its present name in 1908.

2. Defendant, Champion Products, Inc. ("Champion"), is a corporation incorporated under the laws of the State of New York with its principal place of business at 3141 Monroe Avenue, Rochester, New York 14618.

3. Pitt filed this action in the Court of Common Pleas of Allegheny County, Pennsylvania on December 2, 1981. On December 3, 1981, Champion removed the case to this court pursuant to 28 U.S.C. § 1441 (1948). The complaint contains four counts: Count I alleges common law trademark infringement, Count II, trademark infringement under 73 P.S. § 23, Count III, unfair competition, and Count IV, false designation of origin and false description of goods in violation of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1946).

4. Pitt is a major university consisting of undergraduate, graduate and professional schools. It is one of the oldest universities in the United States. Pitt has acquired and enjoyed an outstanding reputation for many years throughout and beyond the United States.

#### b. The Name and Insignia.

5. Since it adopted its present name in 1908, plaintiff, the University of Pittsburgh, has been widely known as "Pitt." "Pitt" and the "University of Pittsburgh" have become synonymous. We are not aware of any other school named or known as "Pitt" or the "University of Pittsburgh."

Shortly after changing its name to the present form, Pitt adopted the panther as its mascot. Since that time, the school's athletic teams have been known and referred to as the "Pitt Panthers," or simply as the "Panthers."

6. The marks "University of Pittsburgh" and "Pitt" were used on Pitt's athletic uniforms more than 50 years ago. More than 30 years ago a student dressed as a panther appeared at Pitt athletic events as a mascot.

#### c. Time Frame.

7. Since at least World War II, Pitt has been selling various articles of clothing bearing one or more of the insignia University of Pittsburgh, Pitt and Pitt Panthers with variants including Pitt's seal and various representations of a panther. Those insignia have been applied to such articles as T-shirts, sweatshirts, jackets, lab coats and neckties. The marks have also been applied to class rings, ceramics, mugs and a wide variety of small articles. In 1980, Pitt applied for and received certificates of registration for some twenty-seven of its insignia with the Commonwealth of Pennsylvania. In 1961, 1971 and 1981, it obtained Pennsylvania registration for its rings and in 1981, for other jewelry. In 1980, it also made six applications to the United States Patent and Trademark Office for various of its insignia.

8. In or about 1933 or 1934, Champion developed a special process for putting insignia on sports and leisure wear, including T-shirts, sweat suits, jackets, polo shirts and shorts. This process replaced the substantially more expensive and time-consuming process of cutting out cloth and hand-sewing each letter or piece of the insignia onto the product. Champion applied for and received a patent for the process. Thereafter, during the mid-1930's utilizing its patented method, Champion began manufacturing and selling soft goods bearing college and university insignia. For at least five years thereafter it was the only company providing such goods. Champion has been a leader and pioneer in the college-related soft goods industry.

d. Activities of Champion.

9. Champion manufactures only soft goods, not novelty items or men's accessories. For purposes of these findings of fact and conclusions of law the term "soft goods" includes T-shirts, sweat suits, polo shirts, jackets and other wearing apparel. It does not include banners, pennants, lab coats or lab smocks, aprons or neckties.

10. Champion's patented method involved a silk screen process used to apply designs and letters to its soft goods. A screen of silk or synthetic material is stretched on a frame. The screen then is coated with a photosensitive material. Next, a transparent sheet called a "brunning," having the desired design printed thereon, is taped to the screen. Light is shown through the transparency onto the screen exposing part of the photosensitive material that blanks off the screen. The unexposed material is washed off leaving openings through which paint or an adhesive may be forced. The paint can pass through only the portion of the screen that corresponds on the transparency. The screen is placed over a shirt and paint is forced through the screen with a squeegee. After the screen is removed the shirt carries the design applied on it. Then the paint is cured, and the process is completed.

11. Champion does not reuse its screens. Three or four dozen shirts can be made from one screen. Additional screens are made for larger orders. When an order is completed, the screen is destroyed. Champion makes 2,000 to 2,500 screens per day.

12. Champion constantly changes the styles and designs it offers. Champion introduces a new full line and a new spring line every year, and prepares and distributes corresponding catalogs to universities and secondary schools throughout the United States.

13. In or about 1936, Champion began manufacturing, offering for sale and selling soft goods with the Pitt insignia in the City of Pittsburgh metropolitan area. These goods were marketed both by presenting samples and by distributing catalogs that identified the products that Champion could produce, including goods bearing the Pitt insignia.

14. From in or about 1936 to the present, Champion's sales were continuous and substantial, with two minor exceptions, one during World War II, and one noted in paragraph 18 herein. Champion has sold soft goods bearing Pitt insignia in each year since 1946 to entities not affiliated with Pitt.

15. From about 1936 to 1960, Champion sold its soft goods bearing the Pitt insignia to the main University book store located on the Pitt campus. During that same period of time, Champion sold Pitt insignia software continuously to others not affiliated with Pitt.

16. Sam Friedland, a salesman for Champion, sold Champion soft goods in the Pittsburgh area from about 1936 until his retirement in 1968. We found Mr. Friedland to be a credible witness. Paragraphs 17 through 19 are based primarily upon his testimony.

17. Prior to or about 1946, while still selling to the on-campus book store and to others, Champion began selling soft goods bearing the Pitt insignia to the Shea Sporting Goods ("Shea"), a retail store that is located close to the Pitt campus but is not affiliated with Pitt. Shea, in turn, marketed these goods to the general public.

18. In or about 1960, Pitt representatives told Mr. Friedland that soft goods, including Champion's products, would no longer be sold in the campus book store. Rather, the book store was restricting its sales to products directly tied to Pitt's educational program. This policy continued at least until 1970. Pitt now sells to the order of individual customers T-shirts that are "decorated" through the application of "heat transfers."

19. Relying on Pitt's cessation of the sale of soft goods at the book store in 1960, Champion, through Mr. Friedland, increased its efforts to find, and was successful in finding, new retailers, not affiliated with Pitt, in the Pittsburgh metropolitan area.

**468**

### e. Knowledge of Pitt.

20. Prior to December, 1980 Pitt never objected to Champion's selling soft goods bearing Pitt insignia. In June, 1981 Pitt asked Champion to execute a license agreement requiring Champion to pay a $100 license fee and a 6% royalty on sales of soft goods bearing Pitt insignia. Champion refused.

21. It is inconceivable that persons in authority at Pitt did not know that Champion soft goods, marked with various Pitt insignia, were being sold at retail outlets other than the Pitt book store. During the 1960's (when these items were not on sale at the Pitt book store), the *Pitt News,* the campus newspaper, carried advertisements for Shea's Sporting Goods and other merchants offering soft goods for sale bearing Pitt insignia.

22. As noted earlier, Champion had begun selling its soft goods to Shea's almost immediately following World War II, in or about 1946. The soft goods were displayed in the windows and on the shelves of Shea's.

23. From 1950 to the present, Champion has printed catalogs which portrayed the full line of Champion products, including goods with the Pitt insignia. These catalogs were sent to the campus book store, as well as to university book stores and non-university affiliated stores across the country.

24. From the time Pitt began its sale of soft goods bearing the Pitt insignia, Pitt students were continuously wearing these T-shirts and other sports and leisure wear to classes and around the campus and local area generally. From 1960 onward, since Pitt knew these products were no longer being sold in its main book store, it was, or should have been, on notice that they were being sold elsewhere.

### f. Reliance by Champion.

25. Champion has borne the risk of building the insignia soft goods business. Through the years, Champion's salesmen have called on and tried to enlist drug-stores, men's wear stores, variety stores and book stores as outlets for its soft wear.

26. Champion maintains quality control on the goods that it manufactures and distributes, with respect to both the materials involved and the imprinting process.

27. Champion has an extensive creative art department for the development of graphics and designs that are used to respond to competitive pressures for new fashion requirements. Champion artists have developed the designs over the years and are constantly modifying them to meet consumer demands.

### g. Lack of Evidence of Fraud.

28. Champion's labels and packaging clearly identify Champion as the source and origin of the goods. Champion's trademarks are well-known and the goodwill connected therewith has been built up over the years of Champion's existence.

29. For many years Champion's marketing of soft goods containing insignia or other identification of colleges or universities has been presented as a total line.

30. Champion has built up substantial goodwill in the business of selling soft goods bearing college or university insignia. Champion has a sales force of between 100 and 125 salesmen who serve more then 10,000 accounts.

31. Champion's products all conspicuously bear the Champion label on the neck.

32. Champion has for many years sold its product with the Pitt insignia through the Pitt book store (except for the period 1960–1970).

33. Champion has marketed its goods with the Pitt insignia openly and notoriously in the Pittsburgh area, and there is no evidence of intent to confuse the public as to source or origin.

34. Champion has marketed its goods at trade shows sponsored by the National Association College Stores, which the Director of Pitt's book store attended.

35. Pitt introduced some testimony at trial through Jay McKenzie, a Pittsburgh

retailer, that some unidentified person, who answered the telephone at Champion, had advised him that Champion did, indeed, have a license to use Pitt insignia on its soft goods. Champion personnel denied this, and we find the testimony under these circumstances not to be relevant to the issue of fraudulent concealment by Champion.

#### h. Senior Usage.

36. Pitt had soft goods marked with the word "Pitt" prior to the establishment of Champion as a corporation in the nineteen twenties.

37. The impetus for the use and large scale selling of soft goods with Pitt insignia came with the patent of the silk screen process by Champion and the assignment of Mr. Friedland as Champion salesman in the Pittsburgh area.

### III.

#### Conclusions of Law

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331(a), 1332(a)(1) and (c), 1338(a) and (b), and the principle of pendent jurisdiction.

2. In a trademark infringement action, the defense of laches is established, and a plaintiff is entitled to no relief where there has been: (1) a long period of unexcused inaction on the part of plaintiff, (2) open and notorious use by the defendant of the allegedly infringing trademarks, and awareness by the plaintiff of such use, (3) reliance by the defendant to its detriment on the inaction of plaintiff, and (4) lack of evidence that the initial use by defendant of the trademark was fraudulent. *See Anheuser-Busch v. DuBois Brewing Co.*, 175 F.2d 370 (3d Cir. 1949), *cert. denied*, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1353 (1950).

3. The principle of laches bars plaintiff's request for an injunction and for an accounting under the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1946).

4. The principle of laches also bars plaintiff's claims under state law. *See Artus Corp. v. Nordic Co., Inc.*, 512 F.Supp.

1184, 1187 (W.D.Pa.1981) ("Pennsylvania jurisprudence with respect to unfair competition and the Lanham Act, 15 U.S.C. § 1125(a), are identical except for the federal requirement of interstate commerce, an element not here in dispute."); *Consolidated Home Specialties Co. v. Plotkin*, 358 Pa. 14, 30, 55 A.2d 404, 412 (1947) ("If the owner of a tradename acquiesces so long in the use of that name or in a name strikingly similar thereto that the public has in general become aware of the other's appropriation of that name and is therefore not deceived, such owner may in a proper case be treated as having abandoned his one-time property right in that name.")

An appropriate order follows.