**UNIVERSITY OF PITTSBURGH, a non-profit corporation, Plaintiff,**

**v.**

**CHAMPION PRODUCTS, INC., a corporation, Defendant.**

Civ. A. No. 81–2167.

United States District Court, W.D. Pennsylvania.

June 23, 1983.

Walter Blenko, Buell, Blenko, Ziesenheim & Beck, Pittsburgh, Pa., for plaintiff.

William H. Hauser, Anderson, Moreland & Bush, Pittsburgh, Pa., Paul J. Weiner, Breed, Abbott & Morgan, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

COHILL, District Judge.

### Introduction

This is the second set of findings of fact and conclusions of law we have issued in this case.

We have considerable sympathy for the plaintiff, University of Pittsburgh ("Pitt"). The notion that a university's name and insignia are its own property, to do with as it chooses, has a certain common-sense appeal. An examination of the law and the facts in this case has convinced us, however, that neither Congress, nor the Pennsylvania Legislature, nor the common law has created the property right that Pitt asserts here. We believe that were we to rule in favor of Pitt, we would be creating a new substantive right in an area of the law in which Congress and the states have legislated extensively. The relief sought by Pitt is not minor; it amounts to a judicially created, perpetual monopoly on a product, Pitt-insignia soft goods, which many people wish to purchase.

For the reasons that follow, we believe that Pitt has failed to prove a violation of either federal or state trademark law by Champion Products, Inc.

### Findings of Fact

#### I.

#### Procedural Background

1. This case is before us on remand from the United States Court of Appeals for the Third Circuit. *University of Pittsburgh v. Champion Products Inc.,* 686 F.2d 1040 (3d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) (hereinafter "686 F.2d at ——").

2. Our original opinion of January 7, 1982, *University of Pittsburgh v. Champion Products, Inc.,* 529 F.Supp. 464 (W.D.Pa.

1982), dealt only with the question of laches. The Court of Appeals reversed only to the extent that it held that Pitt's claim for prospective injunctive relief was not barred by laches. The Court of Appeals remanded the case for disposition of all the remaining issues. 686 F.2d at 1049.

3. The Court of Appeals specifically affirmed our findings of "historical facts." 686 F.2d at 1041.

## II.

### *Supplemental Findings of Fact*

1. We now specifically reaffirm our original Findings of Fact 1–37 made January 7, 1982. 529 F.Supp. at 465–469. Findings of Fact 5–6 and 36–37 will require further explanation because of the additional issues present on remand.

### A. *Likelihood of Confusion*

2. We find, as a matter of fact, that there is no likelihood of confusion, whether of source, origin, sponsorship, endorsement, or any other nature, between the soft goods of defendant, Champion Products, Inc. ("Champion"), emblazoned with Pitt insignia, and with the plaintiff, Pitt.

3. This finding rests upon, *inter alia,* the following facts:

(1) Champion's long-standing sales of the Pittsburgh insignia soft goods in commerce without any instances of actual confusion (Original Findings 14–15 and 35 and Supplemental Findings 4–21 hereunder);

(2) The total absence of any other probative evidence of consumer attitudes or reactions (Supplemental Finding 22 hereunder);

(3) Champion's efforts to indicate the actual source, origin, sponsor, and endorser— *i.e.,* Champion—of the Pitt insignia soft goods at issue (Original Findings 28–31 and Supplemental Findings 23–24 hereunder);

(4) The lack of any evidence that Champion has ever done anything to indicate or represent that the Pitt insignia on its soft goods amounted to an indicator of source, origin, sponsorship or endorsement (Original Findings 32–35 and Supplemental Findings 25–26 hereunder);

(5) The fact that there was no historical custom or practice in the soft goods industry treating the school, college or university insignia prominently emblazoned on the outside of soft goods as an indicator of source, origin, sponsorship or endorsement. (Original Findings 15–19 and Supplemental Findings 27–29 hereunder)

### (1) *Absence of Actual Confusion*

4. We previously found as follows:

"14. From in or about 1936 to the present, Champion's sales were continuous and substantial, with two minor exceptions, one during World War II, and one noted in paragraph 18 herein. Champion has sold soft goods bearing Pitt insignia in each year since 1946 to entities not affiliated with Pitt.

"15. From about 1936 to 1960, Champion sold its soft goods bearing the Pitt insignia to the main University book store located on the Pitt campus. During that same period of time, Champion sold Pitt insignia software continuously to others not affiliated with Pitt."

529 F.Supp. at 464, 467.

5. Despite these 47 years of continuous and substantial sales, Pitt has failed to provide a convincing instance of actual confusion involving these goods, *i.e.,* an instance in which a consumer has purchased or attempted to purchase Champion Pitt insignia soft goods in the erroneous belief that Pitt was the source, origin, sponsor, or endorser thereof.

6. Pitt pointed to only two incidents of supposed consumer confusion.

7. One, was a customer who came to the Pitt Bookstore with a shirt which, according to the customer, had worn out prematurely, and the shirt had been purchased elsewhere.

8. Pitt presented no proof that the garment involved was even a Champion garment. (Bonach, 273–274, 276–278). (Citations to trial testimony will be by witness name and transcript page number throughout these Findings of Fact and Conclusions of Law.) In order to prove likelihood of

confusion between Champion products and Pitt, there would have to be some evidence that a Champion product was involved in the transaction in one way or another.

9. This testimony would at best be an indication of confusion *after* the sale had been made, not of purchaser confusion:

"Not only is this incident suggestive only of confusion *after* a purchase has been made, but also there is considerable evidence of the care taken by [the defendant] to prevent customer confusion including clearly labeling both the product and containers in which they were shipped...."

*Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 237, 84 S.Ct. 779, 781, 11 L.Ed.2d 669 (1964).

10. Finally, there is a third problem with this one alleged incident to which Mrs. Bonach testified. There is no evidence that Pitt ever used the Pitt insignia emblazoned on garments in order to determine which goods had been sold at the university book store or not, and were entitled to return or refund there.

11. That function was performed solely by the sales slip. (Bonach, 276–278).

12. Mrs. Bonach also testified that students had attempted to return books and other goods which did not display the Pitt insignia at all. (Bonach, 277–278).

13. It would not be appropriate to hold that because there is evidence that one person over a period of many years attempted to return retail goods of a particular type which the university book store stocked, but which had been purchased elsewhere, that the university could obtain a permanent injunction against their sale to anyone else.

14. The second incident of alleged confusion to which Pitt referred is the testimony of Mr. McKenzie. (McKenzie, 108–111).

15. This Court has previously found as follows:

"35. Pitt introduced some testimony at trial through Jay McKenzie, a Pittsburgh retailer, that some unidentified person, who answered the telephone at Champion, had advised him that Champi-

on did, indeed, have a license to use Pitt insignia on its soft goods. Champion personnel denied this, and we find the testimony under these circumstances not to be relevant to the issue of fraudulent concealment by Champion." 529 F.Supp. at 468–469.

16. For similar reasons of credibility, we again decline to give any probative weight to this purported incident.

17. Even if Mr. McKenzie were "confused" at all, he was not confused in the trademark sense, *i.e.,* confused as to the source, origin, sponsorship, or endorsement of the goods at issue by observing the goods in the ordinary course of commerce.

18. The record reveals that, at the time of his alleged "confusion," Mr. McKenzie had had a series of in-person conversations and discussions with Mr. Talarico concerning Pitt's early attempts to set up a licensing program of some kind for the Pitt insignia. (McKenzie, 115–119).

19. The record fails to show that Mr. McKenzie, at the time he was "confused," had even looked at the Champion Pitt-insignia soft goods, which are the subject matter of this litigation. (McKenzie, 114).

20. Indeed, assuming that both of these alleged incidents did amount to consumer confusion, such instances of confusion would be so infrequent as to create a presumption *against* likelihood of confusion in the future. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.1980).

(2) *Lack of Any Other Evidence of Consumer Attitudes*

21. Pitt has not introduced any poll, survey, or study, or any other evidence, probative of consumer attitudes or reaction to Pitt-insignia soft goods.

(3) *Champion's Efforts to Indicate the True Source, Origin or Sponsorship of its Pitt-Insignia Soft Goods*

22. We have previously found that:

"28. Champion's labels and packaging clearly identify Champion as the source and origin of the goods. Champion's trademarks are well-known and the good-

will connected therewith has been built up over the years of Champion's existence.

"29. For many years Champion's marketing of soft goods containing insignia or other identification of colleges or universities has been presented as a total line.

"30. Champion has built up substantial goodwill in the business of selling soft goods bearing college or university insignia. Champion has a sales force of between 100 and 125 salesmen who serve more than 10,000 accounts.

"31. Champion's products all conspicuously bear the Champion label on the neck." 529 F.Supp. at 468.

23. For the reasons stated in our previous Findings 28 through 31, we find that Champion has made reasonable efforts to indicate that the true source, origin, sponsor, and endorser of Champion's Pitt-insignia soft goods is Champion.

(4) *Lack of Any Evidence that Champion Had Ever Indicated that the Pitt Insignia Served as an Indicator of Source or Origin*

24. We have previously found that:

"32. Champion has for many years sold its product with the Pitt insignia through the Pitt book store (except for the period 1960–1970).

"33. Champion has marketed its goods with the Pitt insignia openly and notoriously in the Pittsburgh area, and there is no evidence of intent to confuse the public as to source or origin.

"34. Champion has marketed its goods at trade shows sponsored by the National Association College Stores, which the Director of Pitt's book store attended.

"35. Pitt introduced some testimony at trial through Jay McKenzie, a Pittsburgh retailer, that some unidentified person, who answered the telephone at Champion, had advised him that Champion did, indeed, have a license to use Pitt insignia on its soft goods. Champion personnel denied this, and we find the testimony under these circumstances not to be relevant to the issue of fraudulent concealment by Champion." 529 F.Supp. at 468–469.

25. For the reasons stated in our previous Findings 32–35, we find that Champion has never done anything to indicate that the Pitt insignia emblazoned on Champion's Pitt-insignia soft goods constituted an indication of source, origin, sponsorship or endorsement.

(5) *There is No Historical Custom or Practice in the Soft Goods Industry Treating School, College or University Insignia Prominently Emblazoned on the Outside of Soft Goods as an Indicator of Source, Origin, Sponsorship or Endorsement*

26. We have previously found that:

"15. From about 1936 to 1960, Champion sold its soft goods bearing the Pitt insignia to the main University book store located on the Pitt campus. During that same period of time, Champion sold Pitt insignia software continuously to others not affiliated with Pitt.

"16. Sam Friedland, a salesman for Champion, sold soft goods in the Pittsburgh area from about 1936 until his retirement in 1968. We found Mr. Friedland to be a credible witness. Paragraphs 17 through 19 are based primarily upon his testimony.

"17. Prior to or about 1946, while still selling to the on-campus book store and to others, Champion began selling soft goods bearing the Pitt insignia to the Shea Sporting Goods ('Shea'), a retail store that is located close to the Pitt campus but is not affiliated with Pitt. Shea, in turn, marketed these goods to the general public.

"18. In or about 1960, Pitt representatives told Mr. Friedland that soft goods, including Champion's products, would no longer be sold in the campus book store. Rather, the book store was restricting its sales to products directly tied to Pitt's educational program. This policy continued at least until 1970. Pitt now sells to the order of individual customers T-shirts

that are 'decorated' through the application of 'heat transfers.'

"19. Relying on Pitt's cessation of the sale of soft goods at the book store in 1960, Champion through Mr. Friedland, increased its efforts to find, and was successful in finding, new retailers, not affiliated with Pitt, in the Pittsburgh metropolitan area." 529 F.Supp. at 467.

27. Based on the foregoing evidence, we find that there never has been any significant period of time during which (the university) was the sole or exclusive source for Pitt-insignia soft goods.

28. There was evidence in the record that the historical custom and practice regarding soft goods bearing the insignia of other schools, colleges or universities was similar to that present in the instant case. That is, as a matter of custom or practice, the schools, colleges or universities were not the sole or exclusive source of soft goods bearing their insignia. (Christensen, 174, 182, 185; Friedland, 179, 184–185; After, 548–549).

29. We have noted, there is no proof that any consumers erroneously believe that Pitt was either the source, origin, sponsor, or endorser of Champion's Pitt-insignia soft goods.

30. There is utterly no evidence in the record that any consumers attached any importance to the question whether Pitt was the source, origin, sponsor, or endorser of such soft goods.

31. The burden of proof of likelihood of confusion is on Pitt, the plaintiff, as an element of its case.

### B. Functionality

■ 32. Based, inter alia, on Supplemental Findings 38–53 hereunder, this Court makes the following Supplemental Findings 33–37 of ultimate fact:

33. The Pitt insignia, as used by Champion prominently emblazoned on soft goods, are functional.

34. These insignia perform the function of allowing the wearer to express identity, affiliation, or allegiance to Pitt.

35. This functional feature is an essential feature of the product.

36. The product could not perform this function unless it bore the Pitt insignia.

37. The Pitt insignia prominently emblazoned on the Champion Pitt-insignia soft goods is therefore essential to the use or purpose of the articles.

38. As noted by the Court of Appeals, "With negligible exception, a consumer does not desire a 'Champion' T-shirt, he (or she) desires a 'Pitt' T-shirt. The entire impetus for the sale is the consumer's desire to identify with Pitt or, perhaps more realistically, with Pitt's athletic programs." 686 F.2d at 1047.

39. The record clearly established these facts regarding functionality. They were established both by direct evidence, including admissions by Pitt's principal employee-witnesses—Supplemental Findings 40–46—as well as by circumstantial evidence—Supplemental Findings 48–51.

40. "They usually wear it to identify that they are affiliated with the school." (Bonach, 339) (emphasis supplied).

41. "[W]hen the students came in for orientation, the freshman class usually purchased some of the goods to hand out or to sell . . ." (Bonach, 328).

42. "Q: [T]he students at the branch schools would want something to identify themselves within the University, and these T-shirts was the medium through which they could do that?
"A: Yes." (Bonach, 280–81) (emphasis supplied). See also Bonach, 229, 319, 341.

43. "I imagine people purchased it [soft goods with Pittsburgh insignia] because they want to express some type of affinity for the institution." (Talarico, 399) (emphasis supplied), see also Talarico, 391, 401.

44. The Pitt insignia emblazoned upon the front of soft goods do not indicate to the consumer at the time of purchase that Pitt is the source, origin or sponsor of the soft goods.

45. As Mr. Talarico stated, "it would be senseless to buy a garment with the insignia in the back of the collar saying 'Pitt.' You might as well buy any garment." (Talarico, 400–401). Instead consumers view the Champion label on the inside collar as unambiguously identifying all sources and sponsors of the garment. (Bonach, 267; MacKenzie, 125).

46. Pitt's own witness, in response to a question asking how he would determine the source of an item of soft goods, testified, "I would only have to look on the label on the neck." (MacKenzie, 125).

47. Based upon our previous Findings 28 through 31, we find that Champion has taken reasonable steps to designate itself as the true source, origin, sponsor, and endorser of its Pitt-insignia soft goods.

48. Pitt-insignia as used by Champion on its soft goods are prominent features of each item so as to be visible to others when worn, allowing the wearers publicly to express their allegiance to Pitt. (Defendant's Exhibit J; Talarico, 3–14, 16, 22, 298–401; Bonach, 276; MacKenzie, 125).

49. There is no evidence that Champion has ever designated its Pitt-insignia merchandise as "official" or otherwise affirmatively indicated sponsorship by Pitt.

50. Pitt was unable to show any likelihood of customer confusion about the origin, sponsorship, or endorsement of Champion's soft goods, or that it had ever received any complaints about Champion's soft goods. (Findings of Fact 35; Bonach, 273).

51. The evidence suggested that other merchants sold unlicensed Pitt-insignia goods, implying that consumers did not ordinarily purchase soft goods from only "official" sources. (Christensen, 134–36, 143).

52. As noted below, we believe that as a matter of law the burden of proving functionality—or more properly, nonfunctionality—is on Pitt, as plaintiff, seeking to establish the existence of an enforceable trademark.

53. Because the evidence is essentially uncontradicted, we would reach the same findings of ultimate fact on the issue of functionality even if the burden were shifted to Champion as defendant.

### C. *Secondary Meaning*

54. As noted earlier, Champion started selling Pitt-insignia soft goods in 1936.

55. The relevant market is the market for soft goods.

56. Although there may be some evidence in the record which would tend to suggest that the Pitt insignia have taken on a secondary meaning for the provision of educational and athletic services, there is simply no evidence that the Pitt insignia ever have had a secondary meaning for soft goods.

### D. *Priority of Use*

57. With regard to Champion's use, we have already found that:

"13. In or about 1936, Champion began manufacturing, offering for sale and selling soft goods with the Pitt insignia in the City of Pittsburgh metropolitan area. These goods were marketed both by presenting samples and by distributing catalogs that identified the products that Champion could produce, including goods bearing the Pitt insignia.

"14. From in or about 1936 to the present, Champion's sales were continuous and substantial, with two minor exceptions, one during World War II, and one noted in paragraph 18 herein. Champion has sold soft goods bearing Pitt insignia in each year since 1946 to entities not affiliated with Pitt." 529 F.Supp. at 467.

58. As to Pitt's use, we found that:

"6. The marks 'University of Pittsburgh' and 'Pitt' were used on Pitt's athletic uniforms more than 50 years ago. More than 30 years ago a student dressed as a panther appeared at Pitt athletic events as a mascot.

\* \* \* \* \* \*

"7. Since at least World War II, Pitt has been selling various articles of clothing bearing one or more of the insignia

University of Pittsburgh, Pitt and Pitt Panthers with variants including Pitt's seal and various representations of a panther. Those insignia have been applied to such articles as T-shirts, sweatshirts, jackets, lab coats and neckties. The marks have also been applied to class rings, ceramics, mugs and a wide variety of small articles ...

\*    \*    \*    \*    \*    \*

"36. Pitt had soft goods marked with the word 'Pitt' prior to the establishment of Champion as a corporation in the nineteen twenties." 529 F.Supp. at 466, 469.

59. While we did find that Pitt had used goods bearing the Pitt insignia prior to 1936, there is no evidence that Pitt either sold such goods or otherwise introduced them into commerce prior to 1936.

### III.

#### *Conclusions of Law*

For the reasons we have already noted in our original Conclusions of Law No. 1, 529 F.Supp. at 469, we have jurisdiction over this action.

The plaintiff's claims in this suit have four sources: common law trademark infringement, common law unfair competition, the Pennsylvania Trademark Act, 73 Pa.Stat.Ann. § 23 (Purdon's) (repealed in 1982 and replaced by similar language at 54 Pa.C.S.A. § 1123), and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Title 73 Pa.Stat.Ann. § 23 provides:

Subject to the provisions of section 14 hereof [§ 25 of this Title], any person who shall:

(a) Use, without the consent of the registrant, any reproduction, counterfeit, copy or colorable imitation of a trademark or service-mark registered under this act in connection with the sale, offering for sale, or advertising of any goods or services in a manner likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services; or

(b) Reproduce, counterfeit, copy or colorably imitate any such trade-mark or service-mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements, intended to be used in connection with the sale or other distribution in this Commonwealth of such goods or services, shall be subject to a penalty of $100, to be sued for in any court having jurisdiction of an action, by fine or penalty, by a person, co-partnership or corporation aggrieved thereby, and, in addition to the penalty provided for in this section, may award to the plaintiff such damages resulting from such wrongful and unlawful acts as may be proved, and shall require the defendant to pay to the plaintiff the profits derived by such unlawful acts.

The provisions of this section shall not apply to any advertising agency, publisher of newspapers, magazines, or other advertising media accepting authorization for the reproduction or copy of any such trade-mark or service-mark innocently and in good faith in the usual course of business.

Title 73 Pa.Stat.Ann. § 25 provides that:

Nothing herein shall adversely affect the rights in trade-marks or service-marks acquired in good faith at any time at common law.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) provides that:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any

person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

In the context of this case, it appears that all of the plaintiff's claims fall into the general classification of unfair competition with the state and federal claims requiring essentially the same proof in order to support an injunction or other relief. *See Donsco Inc. v. Casper Corp.*, 587 F.2d 602, 605 (3d Cir.1978); *Artus Corp. v. Nordic Co., Inc.*, 512 F.Supp. 1184, 1187 (W.D.Pa.1981); *Quality Weaving Co. v. Regan*, 245 Pa.Super. 66, 369 A.2d 296, 298–300 (1976).

On all of its claims, Pitt, as plaintiff, bears the burden of proving four elements essential to a successful unfair competition case: (a) likelihood of confusion, (b) non-functionality, (c) secondary meaning, and (d) prior use, by a fair preponderance of the evidence. All four elements present questions of fact for us to resolve. Because we have found that Pitt has failed to meet its burden of proving any of these elements, we conclude that Pitt's complaint must fail. Since each of these four elements is essential to Pitt's claim, the failure of Pitt to prevail on any one of these four elements would be adequate to support our ultimate judgment.

## A.  Likelihood of Confusion

Likelihood of confusion on the part of the consuming public is the case issue in any trademark infringement case. Proof of this element is the *sine qua non* of any such case. *See Berlitz School of Languages v. Everest House*, 619 F.2d 211, 215 (2d Cir. 1980). Throughout the nation, trademark law seeks "not to 'protect' trademarks, but to protect the consuming public from confusion...." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978), quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976).

We recognize that one panel of the Court of Appeals for the Fifth Circuit appeared to suggest that a trademark holder had a property interest in its trademark distinct from the prevention of consumer confusion. *See Boston Professional Hockey Association v. Dallas Cap and Emblem Manufacturing Inc.*, 510 F.2d 1004, 1012 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975) ("Boston Hockey"). We believe that it is not the province of the courts to create a property right in gross out of legislation intended solely to protect the consuming public and ethical businessmen from the depredations of manufacturers of counterfeit or deceptive products. The Fifth Circuit has since retreated somewhat from *Boston Hockey* in *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 & n. 3, 1084 & n. 7 (5th Cir.1982) (Requirement of likelihood of confusion as to the presence of "some connection between the items themselves and the owner of the mark." *Id.* at 1084 n. 7). We do not think that *Boston Hockey* is good law. Instead, we are in full accord with the analysis provided in *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918–920 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) ("Job's Daughters"). The *Job's Daughters* Court specifically reiterated the requirement that a plaintiff under section 43(a) of the Lanham Act had to demonstrate likelihood of confusion, *see id.* at 920, as well as nonfunctionality, *see id.* at 917. *See also Pagliero v. Wallace China*, 198 F.2d 339 (9th Cir.1952) (Distinctive china decorations functional. "'Functional', in this sense might be said to connote other than a trademark purpose." 198 F.2d at 343.). "When there is no likelihood of confusion, there can be no trademark infringement." *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311, 319 (5th Cir.1981). As stated in *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir.1977):

Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect

to such things as the product's source, its endorsement by the plaintiff, or its connection with the plaintiff.

Pitt, as plaintiff, bears the burden of proving likelihood of confusion. *Scott Paper Co.,* at 1229–1231. Pitt has totally failed to meet this burden of proof, or indeed provide *any* real evidence of likelihood of confusion. The weakness of Pitt's showing at trial can perhaps best be seen by contrasting it with the proof provided by a plaintiff which did prevail in a case similar to this one.

In *National Football League v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 659 (W.D.Wash.1982) ("Wichita Falls"), the NFL sought, and obtained, an injunction preventing Wichita Falls Sportswear Company from selling replicas of NFL team jerseys to the public. As in this case, the NFL's federal cause of action rested on § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The *Wichita Falls* Court noted that the NFL had to prove likelihood of confusion and held that it had done so. 532 F.Supp. at 657. The evidence adduced by the NFL at trial consisted of a nationwide probability survey which demonstrated that between 41.8% and 53.6% of consumers thought that NFL or individual team authorization was required for the replicas. In short, roughly half the survey population thought the defendant's soft goods were made under some sort of license when, in fact, the defendants had no such license. The NFL also produced live testimony from a retail customer who had actually been confused. *Id.* at 661. Finally, the Court found from the testimony of Wichita Falls' President, an actual intent to confuse the buying public as to authorization or sponsorship. *Id.* at 661–662.

Pitt has in contrast failed to make any real showing of likelihood of confusion. Pitt undertook no survey of any sort to demonstrate likelihood of confusion of source, authorization or sponsorship.

The two supposed incidents of actual confusion demonstrated by Pitt were so vague and infrequent as to imply not only that there is no likelihood of confusion but indeed little chance of any confusion whatever. Pitt has simply failed to provide any evidence from which we could find likelihood of consumer confusion as to source, origin, authorization or sponsorship. The soft goods products at issue here are clearly marked as made by Champion. They are not advertised, described or denominated as "official" or in any way sanctioned by Pitt. There being no likelihood of confusion of any sort, Pitt's claims must fail in their entirety.

### B. *Functionality*

■ Features of a product which are functional are not protected either by the Lanham Act, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 2186 n. 10, 2189–90, 2190 n. 20, 72 L.Ed.2d 606 (1982), or by state unfair competition law. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1969); *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

The Supreme Court has defined functionality as follows:

> "In general terms, a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."

*Inwood Laboratories,* 102 S.Ct. at 2186 n. 10.

■ The burden of proof on functionality, or more precisely, the burden of proving nonfunctionality, is on Pitt, as plaintiff. *SK & F Co. v. Premo Pharmaceutical Lab,* 625 F.2d 1055 (3d Cir.1980). The question of whether or not a product feature is functional is one which we must decide only after a careful evaluation of all the evidence. *See Inwood Laboratories,* 102 S.Ct. at 2190 and 2190 n. 20. Having done so, we conclude that the Pitt insignia as used by Champion are functional characteristics of the soft goods in question.

Consequently, Pitt's claims would fail even if the University could show a likelihood of confusion. *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. at 237, 84

S.Ct. at 781; *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304 (2d Cir.1972); *Restatement of Torts,* § 741. As noted in the Restatement of Torts, § 741, Comment j:

If an imitated feature is functional but has also acquired generally in the market a special significance as an indication of the source of the goods, the imitation is privileged if it is accompanied by reasonable effort to avoid deceiving prospective purchasers as to the source. This may frequently be done by prominent disclosure of the true source. At other times, additional notice may be necessary. What steps are reasonable depends upon the circumstances of each case. If they cannot be taken as a practical matter in a particular case, they are not reasonable in that case. If they are not calculated to avoid deception of customers, or if they would involve a financial expenditure which would substantially hinder competition in the sale of the goods, they are not reasonable. And if there are no reasonable steps to be taken in a particular case, the feature may be imitated despite its special significance.

If the imitated feature is non-functional, then the imitation is unprivileged if, in fact, it is likely to deceive purchasers. Only steps which will effectively avoid this likelihood of deception can render the imitation of such a feature privileged.

By any standard, Champion has made a prominent disclosure of the soft goods' true source. We do not believe, however, that the use of Pitt's name on soft goods has acquired any special significance beyond allowing the garment's wearer to display his or her support for the school and its athletic teams. The insignia on these soft goods thus serve a real, albeit aesthetic, function for the wearer. We do not believe that anyone could seriously argue that the soft goods at issue here are, in any realistic way, in competition with similar, unadorned soft goods. The relevant product market for the consumer in this case is soft goods which allow the consumer to show his or her allegiance to Pitt. There is no evidence that the consumer cares who has made the soft goods or whether they were made un-

der license. Because the Pitt insignia on soft goods serve a functional purpose and largely define a sub market of some size, granting Pitt the relief it seeks would give Pitt a perpetual monopoly over that sub market, precluding any competition in the Pitt insignia soft goods market. We know of no legal theory which would countenance such a result.

### C. *Secondary Meaning*

In order to make out a trademark claim, Pitt, which is primarily in the business of providing educational services, needed to prove that the Pitt insignia had taken on a secondary meaning in the soft goods market prior to the time when Champion entered that market. *Scott Paper Co.* at 1231–1232; *Quaker State Oil Refining Co. v. Steinberg,* 325 Pa. 273, 189 A. 473, 477 (1937).

The Supreme Court has observed that:

To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.

*Inwood Laboratories,* 102 S.Ct. at 2186 n. 11.

As noted earlier, we have found that the relevant market is the market for soft goods, that Champion entered that market in 1936, and that Pitt has failed to prove that the Pitt insignia had taken on a secondary meaning in the market for soft goods prior to 1936, or, indeed, at any time since.

Our finding of no secondary meaning is closely linked to our earlier finding of no likelihood of confusion. In order to prove secondary meaning, Pitt would have had to show a substantial association in the public's mind between the use of Pitt insignia on soft goods and a sense that Pitt was in some way affiliated with the source of the products. *See Wichita Falls,* 532 F.Supp. at 658–659. Pitt made no such showing.

### D. *Priority of Use*

As a necessary element for either a trademark infringement or unfair competi-

tion claim against Champion, Pitt had to prove not only that it had priority of use of the Pitt insignia as against Champion, but also that it had priority of trademark use in commerce.

As was noted in the *Restatement of Torts,* § 719, and Comments "a" and "b" thereto:

§ 719 ADOPTION AND USE.

A designation is not a trade-mark until it is adopted for the purpose of denominating the goods to which it is affixed and is so used in marketing them.

Comment:

a. *Purpose of adoption.* A designation which is adopted not for the purpose of denominating the goods to which it is affixed is not a trade-mark. Thus designations intended solely to indicate the grade, quality or function of goods or designs intended solely as ornamentations are not trade-marks.

b. *Necessity of sale.* To acquire a trade-mark, it is not sufficient for a person to adopt a designation for the purpose stated and affix it to his goods. It is necessary also that he market goods with the affixed designation and that he intend to continue such use of the designation.

We agree fully with these Comments to the Restatement. We believe that the use of the Pitt insignia on the soft goods in question was strictly ornamental. We have already noted that the Pitt insignia were functional and, indeed, defined a sub market within the larger market for soft goods. We see no inconsistency between our finding of functionality and our finding that the insignia were ornaments. Ornaments may well be functional in certain contexts, they simply may not be afforded trademark protection.

Because we have found as a matter of fact that Pitt was not using its insignia as trademarks for soft goods prior to 1936, when Champion entered the market, Pitt does not have priority over Champion in this market.

IV.

*Conclusion*

Pitt has failed to prove any of the essential elements of its case. It has produced no real evidence of confusion on the part of the buying public. It has essentially conceded the functionality of Champion's use of Pitt insignia by admitting that such products are not really in competition with generic soft goods. Pitt has also failed to produce any evidence that its insignia have taken on a secondary meaning. Finally, in the commercial use of the insignia on soft goods, Champion's use was clearly prior to that of Pitt.

In this case, the Pitt insignia are being used for essentially decorative purposes, with neither the intent to confuse the buying public nor any likelihood of accidentally doing so.

For the foregoing reasons, we will enter judgment in favor of the defendant. An appropriate order will issue.