**FRISCH'S RESTAURANT, INC., Plaintiff,**

v.

**ELBY'S BIG BOY OF STEUBENVILLE, INC., et al., Defendants.**

**Civ. A. No. C–2–78–1316.**

United States District Court, S.D. Ohio, E.D.

May 28, 1987.

---

Carl Genberg, Columbus, Ohio, for plaintiff; Leo Sternlicht, Columbus, Ohio, of counsel.

Jennifer L. Sargus, St. Clairsville, Ohio, Arthur M. Recht, Volk, Frankovich, Anetakis, Recht, Robertson, Wheeling, W.Va., Albert Robin, Robin, Blecker & Daley, New York City, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

GRAHAM, District Judge.

### BACKGROUND

This is a civil action for registered trademark infringement under Section 32(1) of the Lanham Act [15 U.S.C. § 1114(1) ], statutory unfair competition under Section 43(a) of the Lanham Act [15 U.S.C. § 1125(a) ], violation of the Ohio Deceptive Trade Practices Act, (Ohio Revised Code Ch. 4165) and breach of contract.

The plaintiff, Frisch's Restaurant, Inc., (hereinafter "Frisch's"), is an Ohio Corporation which has an exclusive franchise to use the trademark and tradename "Big Boy" as applied to a double deck hamburger sandwich in the State of Ohio. The defendants are Elby's Family Restaurants, Inc. a West Virginia Corporation, and related corporations (hereinafter "Elby's"), which operate restaurants in the states of Ohio, West Virginia and Pennsylvania. Certain officers and employees of the corporate defendants are also named as defendants.

Elby's began its restaurant business in 1956 in Wheeling, West Virginia as a Big Boy franchisee of Parkette Commissary, Inc. (now Shoney's Inc.). In the mid–1960's Elby's expanded into Ohio and obtained Big Boy franchise rights from Frisch's. In 1971 Elby's cancelled its Ohio franchise agreements and stopped using the Big Boy tradename and trademark in Ohio. However, Elby's continued to operate Big Boy restaurants in West Virginia and Pennsylvania. This case arises out of Elby's advertising activities in the Wheeling, West Virginia market after 1971 and its use of the Big Boy trademark and tradename in advertising media directed to that market without disclosing that its Ohio restaurants within the coverage of that media were no longer affiliated with the Big Boy chain.

On January 20, 1981, Judge Robert M. Duncan issued a preliminary injunction against Elby's television advertising on Wheeling station WTRF. See: *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., et al.*, 514 F.Supp. 704 (S.D.Ohio 1981). This preliminary injunction was affirmed by the U.S. Court of Appeals for the 6th Circuit on February 3, 1982. See *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., et al.*, 670 F.2d 642 (6th Cir.1982). The court of appeals held that the plaintiff was also entitled to a preliminary injunction against Elby's newspaper advertising in the Wheeling papers.

This matter is now before the court on the plaintiff's claims for damages and attorneys fees. Plaintiff seeks an equitable accounting of all profits earned by those Elby's Ohio restaurants which were the beneficiaries of Elby's advertising in the Wheeling print and electronic media. Plaintiff also seeks recovery of liquidated damages under the terms of one of the subfranchise agreements previously entered into by the parties and finally plaintiff seeks an award of punitive damages.

This matter was bifurcated for trial on the issue of whether or not plaintiff is entitled to recover damages under any of its theories of liability and whether it is entitled to recover attorneys fees under Section 35 of the Lanham Act, reserving for later determination the amount of any such damages or attorneys fees.

### FINDINGS OF FACT

#### 1. THE NATIONAL BIG BOY ORGANIZATION

In 1938, Robert C. Wian of Glendale, California, originated a specially prepared

hamburger sandwich that has subsequently become widely and commonly known as a "Double Deck" hamburger. Wian named this sandwich the "Big Boy". At about the same time he developed a design of a rotund young man, dressed in checkered overalls, holding a Big Boy sandwich in his hand. Wian began using this design in connection with the double deck hamburger sandwich which he sold at a small restaurant in Glendale. Wian and later Robert C. Wian Enterprises, Inc., a California corporation, filed copyright registrations and United States trademark registrations for the design and the words "Big Boy". Thereafter, Wian established a chain of drive-in restaurants in Southern California under the name "Bob's Big Boy" and began granting licenses to others to use the Big Boy symbol and tradename in the restaurant business. It appears that through this process, Wian created one of the first drive-in restaurant chains.

The Big Boy symbol and the name have been registered as trademarks, tradenames and service marks under various filings in the United States Patent Office. The Big Boy symbol and tradename is used to promote the entire restaurant operation not just the double deck hamburger.

In 1974 Wian sold his rights in the Big Boy trademark and tradename to the Marriott Corporation. By the 1980's there were approximately 900 Big Boy restaurants throughout the country. Marriott conducts national franchising activities under the name Big Boy Restaurants of America.

There is a distinct lack of uniformity in the Big Boy system. Franchisees have always been permitted to associate their own tradenames with the Big Boy tradename. As a consequence Big Boy restaurants have been operated under many names, including the following: Abdows, Azars, Bob's, Elby's, Elias Brothers, Frisch's, J.B.'s, Kip's, Marc's, Shoney's, T.J.'s. The Big Boy national franchisees operate independently according to their own wishes, they follow no set format. About the only thing they have in common is the use of the Big Boy tradename. As a result there is great variation among the Big Boy operators in the kinds of foods sold and the kinds of restaurants they are sold in.

The Big Boy double deck hamburger itself is not uniform in its preparation and presentation and with the exception of basic requirements such as size and thickness of bun and minimum amount of hamburger content, the operators are free to vary the preparation of the Big Boy sandwich. An example of this is Frisch's use of a plain bun, tartar sauce and no pickle in contrast to Elby's use of a sesame seed bun, thousand island sauce and a pickle.

There is also some lack of uniformity in the presentation of the Big Boy symbol. Frisch's developed and registered its own Big Boy symbol which is distinctly different from the Big Boy symbol licensed by the national organization.

One witness seems to have aptly described the Big Boy system during the 1960's to the 1980's as: "a very loose network ... little pockets of ownership ... restaurants all over the country with individuals with egos [who] ... thought they knew how to run their restaurants the best; and there were different forms of operations.[1]

When Wian began granting licenses for the use of the Big Boy trademark and design, they covered geographical areas, specifically entire states. The licenses were not limited to locations or marketing areas. Inherent in this scheme is the potential for more than one Big Boy operator to exist in a marketing area which happens to overlap state boundaries. The present case is an example of this.

The cities of Wheeling, West Virginia, Bridgeport, Ohio, Martins Ferry, Ohio, Steubenville, Ohio, and other Ohio, West Virginia and Pennsylvania communities, located in and around Wheeling, constitute one marketing area. Since 1946, Frisch's has had the Big Boy franchise rights for Ohio and various other organizations have had the franchise rights for West Virginia and Pennsylvania.

1. Testimony of Arnold Lazarus Tr. 122.

The Big Boy license agreements do not restrict the licensee from operating restaurants under its own tradename in areas where it does not have a license to operate Big Boy restaurants, nor do they restrict a franchisee from operating restaurants under its own tradename after termination of its Big Boy rights. The failure to include provisions restricting the franchisee's use of a tradename it has used in association with the Big Boy tradename has spawned related litigation with the Shoney's organization, See: *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261 (6th Cir.1985).

From all of the above one could conclude that Mr. Wian did not create an ideal plan for a national restaurant chain. The franchising business has become much more sophisticated since he opened his first hamburger restaurant in the late 1930's. The legitimate expectations and legally enforceable rights of a Big Boy franchisee must be viewed in light of the unusual nature of the Big Boy franchising arrangement and its unique history. This court agrees with the conclusion reached by its colleague which was affirmed by the court of appeals in *Frisch's Restaurant, Inc. v. Shoney's, supra:*

> ... it is clear that the Big Boy mark does not serve as an indication of a single source of origin. ... given its use in the particular commercial context involved here, it cannot be considered "distinctive" in the broader meaning of that word and, hence, for our purposes, must be considered a relatively weak mark.[1] (Memorandum and Order 3/7/84, p. 19, Case No. 1–82–834).

## 2. THE FRISCH'S ORGANIZATION

Sometime during the early 1940's, David Frisch, who then operated two restaurants in Cincinnati, Ohio, traveled to a convention in California and saw a Bob's Big Boy Restaurant. Frisch immediately concluded that Wian's double deck hamburger and Big Boy design could be used as a valuable marketing tool. He initiated contact with Wian which led to the granting of a license from Wian to Frisch on January 1, 1946. Frisch received an exclusive license for the use of the Big Boy trademarks and designs in the States of Ohio, Kentucky, Indiana and Florida.

In 1946 or 1947, Frisch opened his first Big Boy restaurant in the Cincinnati area. It was an immediate success and Frisch began establishing other locations. In 1950, Frisch began granting sub-licenses to other operators. The Frisch's organization now operates 103 Big Boy restaurants and licenses an additional 70. Frisch's derives substantial revenue from franchise fees. Frisch's spends large sums of money advertising its restaurants and its ads always feature the Big Boy name.

Frisch's has copyrighted its own Big Boy symbol which is significantly different from the Big Boy symbol registered by Wian. The Frisch symbol pictures a different character but in recent years Frisch's has changed the appearance of this figure so that it more closely resembles the Wian-Marriott figure.

Frisch's has never developed its Big Boy rights in Eastern Ohio other than through the sublicense agreements which are involved in this litigation. Frisch's has no locations east of Zanesville, Ohio. During the period of time involved in this litigation, Frisch's and Elby's were not competitors in the Eastern Ohio market, nor are they at present. Frisch's TV advertising in Ohio is conducted on the Cincinnati, Dayton and Columbus stations and its newspaper advertising is limited to Central Ohio.

## 3. THE ELBY'S ORGANIZATION

In 1956, George, Ellis and Michael Boury acquired from Parkette, Inc., the predecessor of Shoney's, Inc., the right to operate Big Boy Restaurants in the panhandle region of Northern West Virginia. They then constructed their first Big Boy Restaurant in Wheeling, West Virginia. The Bourys originally called their Big Boy Restaurants "Elby's Big Boy Restaurants". By 1966, they were operating five (5) restaurants in and around Wheeling, West Virginia, and desired to expand their operations across the Ohio River into Eastern Ohio. At that time, they negotiated with David Frisch and obtained a license autho-

rizing the operation of an Elby's Big Boy Restaurant in St. Clairsville, Ohio. In 1969, they negotiated with the Frisch organization and obtained a license for an Elby's Big Boy restaurant in Steubenville, Ohio.

In the fall of 1970, the Bourys decided to establish an Elby's Big Boy in Cambridge, Ohio and again negotiated with the Frisch organization for a license agreement. However, on this occasion the parties were unable to agree. By letter dated July 31, 1971 Elby's notified Frisch's that they were terminating all of their license agreements in Ohio and that they would no longer use the Big Boy name in connection with their restaurant operations in Ohio. Thereafter, Elby's established additional restaurants in the Eastern Ohio cities of Bridgeport, Dover, Marietta, and Zanesville.

By 1984 Elby's was operating 55 to 60 Elby's Family Restaurants in Ohio, Pennsylvania and West Virginia. In West Virginia and Pennsylvania the Big Boy tradename and symbol were used, in Ohio they were not. From 1956 to 1971, Elby's regarded the Big Boy mark and name as having value and in fact licensed the Big Boy trademark and tradenames to other operators in Pennsylvania and West Virginia.

"Elby's" is a service mark for restaurant services belonging to Boury Brothers, a partnership, registered April 22, 1975, in the United States Patent Office. The Elby's mark is used in association with a red hexagon used both as a logo and as an outdoor restaurant sign.

The Ohio, Pennsylvania and West Virginia Elby's Family Restaurants are similar in appearance and all use the same format, same menu, and same recipes.

Elby's is and has always been headquartered in Wheeling, West Virginia.

### 4. THE FRISCH'S—ELBY'S RELATIONSHIP

The original sub-license agreement (St. Clairsville, Ohio) between Frisch's and Elby's specifically provides that upon termination the licensee shall cease and discontinue the use of tradenames which the licensee has been privileged to use by reason of the terms of the agreement. The agreement has an addendum dated February 28, 1987 which makes it clear that Elby's will operate its restaurants under the name "Elby's Big Boy". The sub-franchise agreement for the second Ohio location (Steubenville) is in similar form. This agreement contains additional provisions relating to the improper use of names or marks after termination and specifically provides:

"Upon expiration of the license by reason of the expiration of the term thereof or sooner termination for any reason or under any condition herein set forth, the Licensee shall cease and discontinue the use of the name "Frisch" and/or "Frisch's", "Big Boy" and any other trade names which the Licensee has been privileged to use by reason of the terms of this agreement ... Should Licensee fail to thus eliminate or obliterate any such name or design and any and all advertising, of every kind and nature ... within fifteen (15) days after written demand by Licensor ... in any such event Licensee further agrees to pay Licensor as liquidated damages One Hundred ($100.00) Dollars per day for each use of any such trade name or trade mark in connection with Licensee's business after the expiration of the fifteen (15) days hereinabove mentioned, and Licensee agrees, in addition, to pay to the Licensor all attorneys' fees, court costs and other legal expense incurred by the Licensor in eliminating improper use by Licensee as herein provided of any such names or marks.".

There is no provision in the sub-franchise agreements which requires Elby's to cease the use of its name "Elby's" after termination.

In 1970, the parties negotiated regarding an agreement for a location in Cambridge, Ohio. An agreement and addendum similar to those previously entered into was signed by Elby's but not by Frisch's.

Elby's never used the Frisch's Big Boy symbol, or the name "Frisch's"; instead

they used their own name and the Wian-Marriott Big Boy symbol.

## 5. TERMINATION OF ELBY'S BIG BOY RELATIONSHIP

On July 30, 1971, Elby's gave Frisch's formal notice of termination of its Ohio sub-franchise agreements effective August 1, 1971.

Elby's then removed from its Ohio restaurants all Big Boy signs, statues, printed materials, menus, matchbooks, table tents, carryout sacks, guest checks, and all other paper materials which contained the Big Boy symbol or tradename. Employees were instructed not to refer to the double deck hamburger sold in these restaurants as a "Big Boy" and to answer the phone "Elby's Family Restaurant". Telephone listings were changed. Elby's training director held meetings with employees to instruct them about the change in name and the new procedures. Employees were instructed that in the event a customer ordered a Big Boy sandwich they were to be told that it was not sold at the restaurant and they should be offered an Elby's double deck hamburger instead. The sauce used in this Elby's double deck hamburger was different from the sauce used in the Big Boy hamburger previously sold in these restaurants.

Elby's management instructed its advertising department not to use the Big Boy tradename or symbol in Ohio advertising. These instructions were followed with respect to advertising placed in the Martins Ferry Times Leader, the Steubenville Herald Star and WSTU–TV the Steubenville, Ohio television station. All advertising materials were recalled from the various media in order to prevent the mistaken use of the Big Boy tradename or symbol in Elby's advertising. Robert H. Diehl, who was then the advertising director of the Martins Ferry Times Leader, testified that in that position he was instructed by the Elby's organization to carefully screen their ad copy to assure that the Big Boy symbol was not used inasmuch as they were not authorized to use the symbol in their Ohio advertising.

After August 1, 1971, Elby's television and newspaper advertising originating in the State of Ohio made no reference to Big Boy or the Big Boy symbol. When an Ohio restaurant was advertised in the Wheeling newspapers there was no reference to the Big Boy system or the Big Boy symbol.

Thirteen years after cancelling its Ohio subfranchise agreements, Elby's officially terminated its Big Boy franchise agreements in West Virginia and Pennsylvania. Thus on August 3, 1984, Elby's severed all ties with the Big Boy organization.

For a considerable time prior to terminating its West Virginia and Pennsylvania Big Boy franchises, the Elby's organization had made a conscious decision to de-emphasize the Big Boy symbol and tradename. In accordance with this program, the Big Boy symbol and tradename were used less frequently and were displayed less prominently. Greater emphasis was given to the Elby's tradename, the red hexagonal symbol and the tradename Elby's Family Restaurant.

Elby's decided to de-emphasize the Big Boy because it felt that the mark was weak and because the hamburger was its main theme. Elby's wanted to promote its restaurants as full menu, full service, family restaurants. Elby's had in the meantime developed its own method of service, its own menu and its own building design and had established good will in its own trade name. In this respect there are many similarities between Elby's marketing strategy and that of Shoney's as described in *Frisch's Restaurant, Inc. v. Shoney's, Inc., supra.*

## 6. THE ALLEGED INFRINGEMENT

*a) The Wheeling marketing area.*

When Elby's terminated its sub-franchise agreements with Frisch's it was operating 9 restaurants, most of which were clustered around Wheeling, West Virginia. There were 3 restaurants in Ohio: Steubenville, St. Clairsville and Cambridge; and 5 restaurants in West Virginia.

Wheeling has a population of approximately 45,000 and is the dominant commu-

nity in the area. It is located on the Ohio River and is connected to Ohio by a multi-lane highway bridge which carries the traffic of Interstate Route 70. There are many satellite communities in and around Wheeling on both sides of the Ohio River.

The local television stations in this area are: WTRF–TV Wheeling and WSTU Steubenville, Ohio. WTRF's studios are located in Wheeling while its transmitter and antenna are located across the river in Bellaire, Ohio.

The newspapers which circulate in the area include the Wheeling News Register (evening and Sunday) and the Wheeling Intelligencer (morning) both published by Ogden Newspapers, Inc. of Wheeling; the Martins Ferry Times Leader of Martins Ferry, Ohio and the Steubenville Herald Star of Steubenville, Ohio.

The yellow pages directory for Wheeling is shared by the Ohio cities of Bellaire, Martins Ferry, Bridgeport, and St. Clairsville.

The evidence indicates that the Wheeling metropolitan area, consisting of communities on both sides of the Ohio River, functions as a marketing area which largely ignores the Ohio-West Virginia state line.

For many years prior to the termination of its Big Boy Franchises in Ohio, Elby's had been advertising all of its restaurants in the local media including WTRF–TV, the Wheeling News Register and the Wheeling Intelligencer. Small block ads listing all locations appeared in the Wheeling yellow pages directory. Elby's primary sales tool for the local market was its weekly specials, a menu item selected and specially priced and featured in its television and newspaper ads and displayed on the "Wagner board" (an on-site display sign with replaceable letters) at each restaurant. During this period the Elby's restaurants were all operated as Big Boy restaurants and the Big Boy symbol and tradename was used extensively in the Elby's advertising.

As noted earlier, this litigation concerns Elby's continued use of the Wheeling advertising media to promote all of its restaurants after termination of its Ohio Big Boy franchisees without calling attention to the fact that its Ohio restaurants were no longer a part of the Big Boy chain.

*b) WTRF–TV.*

WTRF's coverage area includes 17 Eastern Ohio counties. WTRF shares its market area with WSTU of Steubenville. The Pittsburgh stations also reach this area and its ABC affiliate reaches as much as 22% of the viewing audience in prime time.

A 1979 Neilson coverage study indicated that in Belmont County (St. Clairsville) WTRF commanded 46.6% of the viewing audience, WSTU 19%, in Jefferson County (Steubenville) WTRF 19.8%, WSTU 28.9% and in Guernsey County (Cambridge) WTRF 36.8%, WSTU 27.1%. Frank Curtis of WTRF testified that 25–30% of WTRF's total viewing market is in Ohio, the balance is in West Virginia and Pennsylvania.

After the 1971 disaffiliation of the Ohio restaurants Elby's advertising on WSTU did not use the Big Boy trademark or tradename. There was no evidence that Elby's ever advertised on any of the Pittsburgh stations received in the area. Frisch's has never advertised on any of these TV stations and has no restaurants in the WTRF coverage area.

In 1971 Elby's entered into a reciprocal advertising agreement with WTRF in which it agreed to install billboards advertising WTRF at various restaurant locations. In addition Elby's agreed to prepare and distribute paper goods which promoted WTRF, including table tents, match books, sugar packets and carryout bags. Under the agreement Elby's paid for a certain dollar amount of television advertising and WTRF agreed to deliver a substantial additional dollar amount of T.V. time in return for Elby's promotion of the station. The parties referred to this as a "trade order". The agreement was renewable yearly and with periodic adjustments increasing the number of Elby's locations and the dollar amounts of television advertising, it remained in effect for the next ten years. This arrangement was not unique to WTRF. Elby's made similar arrangements

with television stations in Erie, Pennsylvania and Columbus, Ohio.[2]

After the termination of the Ohio Big Boy franchises, the main theme of the Elby's commercials aired on WTRF continued to be the weekly specials. This theme was tied in to some of the WTRF promotion done by Elby's. The billboards displayed the WTRF logo, with the message "watch for Elby's specials on WTRF–TV 7". Elby's carryout bags contained a similar message. The sugar packets and match books were imprinted with the WTRF logo but made no reference to the Elby's commercials. None of the paper items used the Big Boy tradename or trademark. The Big Boy sandwich was never featured as a weekly special.

By 1980 the WTRF reciprocal advertising agreement included 15 Elby's restaurants, 8 in West Virginia and Pennsylvania which were Big Boy restaurants and 7 in Ohio which were not. From 1972 on, WTRF was broadcasting approximately 1,100 Elby's commercials per year or an average of 21 per week.

The Elby's T.V. commercials aired on WTRF varied significantly in their use and emphasis of the Big Boy symbol and tradename from heavy emphasis to no use at all.

The evidence revealed two distinct kinds of commercials were used to advertise the Elby's weekly specials which were available at all Elby's restaurants in Ohio, West Virginia and Pennsylvania. One contained a prominent reference to the Big Boy tradename, the other did not.

The WTRF commercials were not limited to Elby's weekly specials but included other kinds of commercials, some produced specifically for Elby's and others produced by Big Boy Restaurants of America (Marriott). Commercials in the former category included Christmas and graduation commercials which featured gift certificates. These contained no visual or audio reference to Big Boy. Very similar to those was a Mother's Day commercial which contained no visual or spoken reference to Big Boy but concluded with a muted rendition of the musical jingle "You're going to love Elby's Big Boy". Two other commercials of similar design advertised breakfast and a summer salad special and contained no visual or audio references to Big Boy except for the concluding jingle. Finally, a series of seafood festival commercials contained no audio or visual reference to Big Boy whatsoever.

### c) Newspapers.

The retail trading zone in which the Wheeling Intelligencer and the Wheeling News Register circulate includes Belmont, Jefferson, Monroe, and Harrison Counties in Ohio. The retail trading zone is defined as that area where coverage is 20% or more. During 1979 the circulation of these newspapers was as follows: Intelligencer (morning): Ohio 10,203, West Virginia 13,982; News Register (evening) Ohio 2,985, West Virginia 25,233; Sunday News Register Ohio 26,291, West Virginia 37,875. A vending machine for the Wheeling papers was located at the Elby's restaurant in St. Clairsville, Ohio. Two evening papers published in Ohio also circulated in this area, the Martins Ferry Times Leader and the Herald Star.

Elby's advertised regularly in the Wheeling papers. Again the dominant theme of the advertising was the weekly specials which were available at all restaurants including Ohio. The ads contained the Big Boy symbol in association with Elby's tradename "Elby's Family Restaurants." The ads did not refer to any specific locations. They did not advise the readers after August, 1971, that the Ohio restaurants were not a part of the Big Boy chain. After disaffiliation of the Ohio restaurants Elby's ads in the Ohio papers did not use the Big Boy trademark or tradename. On two occasions openings of Ohio restaurants were advertised in the Wheeling papers

---

**2.** The Columbus advertising did not use the Big Boy name or symbol and Elby's had no Ohio restaurants within the coverage of the Erie, Pennsylvania station, thus those situations are relevant only insofar as they show that Elby's did not implement such arrangements solely for the purpose of improperly linking its disaffiliated Ohio restaurants with its West Virginia and Pennsylvania Big Boy restaurants.

and these ads contained no reference to Big Boy.

### d) Yellow Pages.

Elby's yellow pages advertising prepared for the Wheeling directory also appeared in the directories for the Ohio communities of Bridgeport, Bellaire, Martins Ferry and St. Clairsville.

These ads featured the Big Boy symbol, the slogan, "Home of the Big Boy" and listed the West Virginia restaurants followed by a listing of the Ohio restaurants under the heading "Other Elby's Family Restaurants" all within the same block ad.

Another version of Elby's Yellow Pages advertising was similar except that it states: "W.Va. Home of the Big Boy" followed by a listing of the West Virginia locations, then the statement "also in Ohio Elby's Family Restaurants", followed by a listing of the Ohio locations, again all in the same block ad.

The yellow pages advertising was relatively small in size consisting of 2½" × 4¼" block ads.

### e) Menus.

Elby's menus used during the 1970's listed all Elby's locations on the back. Originally, the Pennsylvania and West Virginia menus which carried the Big Boy symbol on the front and a listing of the locations on the back made no distinction between the locations but simply listed them all under the heading "visit these Elby's Family Restaurants". The Big Boy symbol was not used on the back of the menu. A similar presentation appeared on the back of the Ohio menu which did not use the Big Boy symbol and did not make any reference to the Big Boy tradename. Later the listings on the back of the West Virginia and Pennsylvania menus were changed so that the restaurants in those states were listed under the headings "West Virginia Home of the Big Boy" and "Pennsylvania, Home of the Big Boy" followed by the heading "And these Elby's Family Restaurants: Ohio" followed by a listing of the Ohio locations. Again the Big Boy symbol was not used on the back of these menus

and again the Ohio menus which listed all locations did not identify any of them as Big Boy Restaurants.

A breakfast menu for West Virginia and Pennsylvania restaurants published in January, 1972 prominently featured the Big Boy symbol and stated: "Elby's is one of more than 630 Big Boy restaurants from coast to coast". There was no evidence indicating that this menu was used in Ohio, or the extent or length of its usage elsewhere.

The food items displayed in the menus used in Ohio, West Virginia and Pennsylvania were identical with the exception of the Big Boy double deck hamburger which did not appear in the Ohio menus. In its place was an identical appearing sandwich referred to as the "Elby's double deck hamburger."

### f) Other Advertising.

From time to time after 1971 Elby's engaged in free certificate promotions valid for Big Boy hamburgers and Coca Cola. In addition, Elby's sold gift certificate books at both its West Virginia and Ohio restaurants. The gift certificates for the West Virginia and Pennsylvania restaurants carried the Big Boy symbol. As a result of confusion which occurred when customers would present Big Boy certificates at the Ohio restaurants, Elby's issued a bulletin dated June 20, 1974 instructing its personnel that all restaurants would honor the gift certificates.

Elby's advertised on the Wheeling, West Virginia radio station WWVA which has daytime coverage which extends well into Eastern Ohio and nighttime coverage throughout the entire Northeastern United States. After 1971, Elby's continued to run commercials on this station which included the Big Boy jingle. There was no evidence as to the frequency of this advertising or its duration.

Elby's made use of a Big Boy costume character in promoting an annual Halloween parade held in Wheeling, West Virginia. This costume character also appeared at a national distance race (foot race) which

Elby's has sponsored for the past 11 years. The race takes place in Wheeling, West Virginia and draws contestants and spectators from many other states. The Big Boy symbol has been used on publicity associated with the race.

On November 19, 1972, Richard Metcalf of the Frisch's marketing department made telephone calls to the Elby's restaurants in Cambridge, Steubenville and St. Clairsville, Ohio. In each instance the telephone was answered "Elby's Family Restaurant". Mr. Metcalf then inquired if this was "Elby's Big Boy" and received an affirmative response. He then proceeded to place carryout orders for Big Boy sandwiches which were accepted. There was no evidence of similar events occurring on any other date before or since.

## CONSUMER SURVEYS, EXPERIMENTS AND TESTIMONY OF EXPERTS

Through the use of expert testimony and the results of consumer surveys, plaintiff sought to prove that Elby's advertising resulted in actual confusion about the affiliation of Elby's Ohio restaurants with the Big Boy chain and the availability of Big Boy sandwiches at those restaurants.

Lee B. Becker, Ph.D., testified regarding two surveys and three experiments he conducted on behalf of the plaintiffs. The first survey was done in 1979 and involved three communities in Southeastern Ohio. The second survey was done in 1983 and was entitled "Survey of Purchasing Habits, Nine Counties, Eastern Ohio." The experiments sought to test the effect of television commercials shown to volunteer participants in shopping malls in St. Clairsville, Ohio and Columbus, Ohio in October and November of 1983.

Leonard Wood, Vice Chairman of the Gallup organization testified regarding market opinion research conducted on behalf of the plaintiff in late 1985. This was a survey to investigate the public's recognition of various symbols and to determine the extent of confusion, if any, which existed among consumers in Eastern Ohio regarding the use of the Big Boy symbol.

## 1979 BECKER SURVEY

Becker's 1979 survey involved 300 telephone interviews with heads of households in the Ohio communities of Cambridge, St. Clairsville and Steubenville. Becker testified that this survey showed that a large percentage of the persons in the area studied were confused about the availability of Big Boy hamburgers in Ohio and that many thought the product could be purchased at Elby's Family Restaurants in Ohio. When asked where one would go to purchase a Big Boy double deck hamburger in Ohio, fifty-one point seven (51.7%) percent mentioned Elby's. Ninety-six point three (96.3%) percent of the sample indicated that they received television station WTRF in their homes and seventy-two (72%) percent indicated that they had seen advertisements on that channel for Elby's Family Restaurants. Fifty-six point nine (56.9%) percent of those who indicated they had seen those advertisements named Elby's as the place to purchase a Big Boy double deck hamburger, while thirty-eight point one (38.1%) percent of those who had not seen the advertisements named Elby's as the place to purchase Big Boy products.

Becker prepared a report of the 1979 survey consisting of 7 pages described in the introduction as a "brief summary of the findings." Documentation of the complete results was not provided.

The respondents in this survey were not asked appropriate questions to determine their understanding of what a Big Boy double deck hamburger is or that it is sold exclusively by restaurants associated with the Big Boy chain. When the Big Boy double deck hamburger was first sold back in 1938, it was a unique product, but today double deck hamburgers are common. It is possible that the term "Big Boy" applied to a double deck hamburger sandwich may be considered generic by a significant percentage of the consuming public. This issue was not investigated by Becker. Some of his respondents may have believed that a Big Boy was a type of hamburger as opposed to a specific hamburger only available from a specific source.

Question 2(b) of this survey asked the respondents whether or not they had purchased a Big Boy double deck hamburger at an Ohio restaurant in the last seven years. Elby's was legitimately using the Big Boy trademark and tradename in Ohio until August 1, 1971, a little more than seven years prior to this survey. It is highly unlikely that a person could recall whether or not his purchase of a particular kind of hamburger sandwich occurred seven years ago as opposed to eight years ago. The questions regarding WTRF–TV advertising also used a seven year time frame. Again, it is problematic that the average consumer could make a distinction between a television commercial seen seven years ago as opposed to one seen eight years ago.

Becker found a correlation between confusion concerning Big Boy products and: 1. the respondent's proximity to West Virginia, 2. his or her length of residence in the community, 3. frequent travel to West Virginia and 4. viewing of WTRF commercials. The first three factors are not attributable to any actionable conduct by the defendants.

It is likely that some confusion was caused by the television advertising but the amount is unclear and there was no evidence which indicated that it was influencing consumer decisions so as to cause increased sales at the Elby's Ohio restaurants.

### 1983 BECKER SURVEY

Dr. Becker described the 1983 survey as a survey of purchasing habits in nine counties in Eastern Ohio for the purpose of learning what associations purchasers make between Big Boy and other restaurant names. A total of 1,004 respondents were interviewed. They were selected by random digit dialing and consisted of an equal number of men and women. According to Becker, the results indicated that ninety-four (94%) percent of the respondents had heard of the Big Boy Restaurant chain and forty (40%) percent said there was a Big Boy Restaurant within 10 to 15 miles of his or her place of residence. Six-ty-three (63%) percent of those who thought there was a Big Boy within 10 to 15 miles of their residence associated the name Elby's with that restaurant. Thirty-two (32%) percent said they would go to an Elby's Restaurant to purchase a Big Boy double deck hamburger in Ohio. Sixty (60%) percent identified Elby's as a Big Boy Restaurant. Sixty (60%) percent said they had seen Elby's commercials on television and thirty (30%) percent said they had seen them on WTRF–TV.

Becker testified that in his opinion this survey leads to the conclusion that there was significant confusion among consumers in this nine county area and that a significant percentage of consumers mistakenly believed they could purchase Big Boy products at Elby's Restaurants in Ohio.

Becker did not prepare a formal report regarding the design, methods or results of this survey and the only written documentation provided to the court and counsel were his hand written notes and a copy of the survey questionnaire.

This survey included individuals who said they ate out less than once per month or not at all. A total of seventeen (17%) percent of the respondents fell into that category. The state of mind of these individuals would have little or no relevance.

Question 16 of this survey was as follows: "Now I'm going to name some restaurants. Please tell me if the restaurant I name is a Big Boy restaurant." There followed a list of five restaurants including "Elby's Family Restaurants." The question was not limited to the State of Ohio and any respondent who was familiar with the Elby's operations in West Virginia and Pennsylvania would have properly responded in the affirmative. Becker testified that a respondent should have answered, "It depends on the location" but admitted that they were not told that they should consider that response instead of a yes or no answer.

As was the case with the 1979 survey the respondents were not asked appropriate questions to determine their understanding

of what a Big Boy double deck hamburger was.

Survey Question No. 6 was a leading question. Instead of determining what the respondents thought Big Boy might be, the question tells them it is a restaurant chain. This is repeated in question 7 and it seems clear that this approach may have distorted the responses to all subsequent questions.

Question 7 asks if there is a Big Boy Restaurant in Ohio within 10 to 15 miles of where the respondent lives. Becker was unable to explain why the range of 10 to 15 miles was used. In many instances that radius would have included Elby's Restaurants in West Virginia or Pennsylvania which were legitimately using the Big Boy name and symbol. This question was asked of individuals who responded to the previous question by indicating that they had never heard of the Big Boy Restaurant Chain. Some of these people said yes, there was one near them.

There is a serious omission in the instructions for Question No. 10. This question asks "What is the name of the restaurant in Ohio to which you would go to purchase a Big Boy double deck hamburger?" It is followed by a list of possible locations and Elby's is first on this list. Previous questions involving lists were followed by instructions to the interviewer in capital letters "DO NOT READ LIST." Question 10 was not followed by such a caveat and the interviewers may well have read this list believing that Becker intended them to do so. If this occurred, which seems likely, the position of Elby's at the top of the list would have led to a biased response.

Dr. Becker performed a similar survey in the case of *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261 (6th Cir. 1985). The trial judge in that case found that the survey was defective and assigned little weight to it. The court was particularly disturbed by the survey's use of the term "Big Boy Restaurant" in three key questions and noted that Dr. Becker himself conceded that the term is ambiguous in that it means different things to different people. The court went on to state: "More importantly, however, is the fact that the

use of the term may well have instilled in the respondents the false impression that there exists some sort of chain of restaurants called 'Big Boy Restaurants'". This criticism of Dr. Becker's survey was affirmed by the Court of Appeals which stated:

> "The lower court's observation that the survey predisposed respondents to identify 'Shoney's Town & Country' restaurants as 'a' 'Big Boy Restaurant', does hit the mark." ... This technique is characterized as 'aided awareness' questioning; in effect it 'sets up' the desired response and therefore, has been justly criticized and accorded diminished probative value. [citations omitted]." ... The District Court legitimately concluded, after evaluating this evidence and the testimony of Dr. Becker in defense of this survey, that the measure of actual consumer confusion had not been accurately gauged by this survey. Therefore, it was not clear error to discount the probity of this survey." 759 F.2d at 1268, 1269.

This court has reached the same conclusions regarding Dr. Becker's 1983 survey in this case.

### BECKER T.V. COMMERCIAL "EXPERIMENTS"

Dr. Becker described his television advertisement experiments conducted in October and November, 1983 as follows: One hundred (100) persons were recruited to view videotapes containing television commercials. They were divided into two groups, an experimental group and a control group. These individuals were intercepted at the Ohio Valley Mall in St. Clairsville, Ohio and at the French Market in Columbus, Ohio and if they agreed to participate, they were led to a suitable viewing area. In the first experiment, the experimental group saw four commercials, two of which were Elby's commercials. The control group saw four commercials, none of which were Elby's commercials. The second experiment was a repeat of the first. In the third experiment the experimental group

saw only three ads, one of which was an Elby's commercial.

On the basis of these experiments, Becker concluded that people who saw the Elby's commercials were more likely to believe that one can purchase a Big Boy hamburger at an Elby's Restaurant. Becker did not prepare a report regarding the purpose, design, methods and results of these experiments. The only written documentation provided to the court and counsel was copies of the survey questionnaires, Becker's handwritten notes and a bar graph indicating the number of individuals who responded affirmatively to the question "Where would you go here in Ohio to purchase a Big Boy double deck hamburger?"

In regard to these experiments, again, Becker did not determine the participants' understanding of what a Big Boy double deck hamburger sandwich was. Becker was unable to identify the particular commercials used in the experiments but said he selected them from a videotape given to him by plaintiff's counsel. From his description the court concludes that the commercials were selected from the videotape marked plaintiff's exhibits 3 and 4. However, the commercials on that tape vary significantly in their content and in evaluating the results of these experiments it would have been helpful to know just which commercials were used. Becker's lack of documentation of his procedures seriously detracts from the probative value of his testimony.

Notwithstanding Becker's conclusions about this survey the responses he received to Question 8 indicate that the commercials did not effectively convey the impression that Big Boy products or services were being promoted. Question 8 asked the experimental group what product or service was being promoted in each of the advertisements. In the group that saw two Elby's commercials only 6 out of 100 mentioned Big Boy; in the group of 50 that saw one Elby's ad, none responded "Big Boy".

## GALLUP SURVEY

Leonard Wood, Vice Chairman of the Gallup organization, testified regarding market opinion research conducted on behalf of the plaintiff. This was a survey to investigate the public's recognition of various symbols, in particular the Big Boy symbol, and to determine the extent of confusion, if any, which exists among consumers in Eastern Ohio regarding the use of the Big Boy symbol. A telephone survey was made of adults living within five miles of six towns in Eastern Ohio and residing within a five mile radius of an Elby's restaurant. The phone numbers were randomly selected. Those interviewed were later sent a written questionnaire which contained various product symbols, including the Big Boy symbol. The survey was done between October 22 and December 31, 1985. The respondents were adults 18 years of age and older who had eaten in a family style restaurant in the past year. Gallup concluded that the Big Boy symbol ranked 4th out of 16 symbols tested in terms of recognition and that nearly one third of all adults interviewed in Eastern Ohio associated the Big Boy symbol with Elby's. Fifteen percent of the respondents said Elby's currently uses the Big Boy symbol in their home town. The towns with the highest percentage of individuals so responding were those located nearest the West Virginia border and the percentage significantly declined the farther West a town was located from the West Virginia border.

The Gallup survey, while of a much higher quality than the Becker studies, was subject to legitimate criticisms. The survey questions contained various ambiguities. For example, question 2(c) referring to a symbol inquires: "Who uses it?" The question is not limited to time or place although all of those responding "Elby's" were assumed to be referring to their own home town and the current time. Mr. Wood conceded that the question could have been construed to mean other places and other times. The same criticism applies to question 2(d) which asks "Where have you seen it used?" Again, the responses were interpreted as applying to the

current time and the individual's home town even though the question was not so limited.

Thus, a respondent who remembered that the Elby's restaurant in his community was a Big Boy restaurant in 1971 and before or knew that Elby's had continued to use Big Boy in neighboring West Virginia until late 1984 could have answered "Elby's" to question 2(c) or could have named his own community in answer to question 2(d) without being confused at all.

This study did not attempt to determine whether or not the association between Elby's and the Big Boy symbol affected the respondent's behavior in regard to patronizing Elby's restaurants or purchasing any particular food product. Nor did this study attempt to determine why some respondents associated the Big Boy symbol with Elby's, i.e. whether it was the result of Elby's failure to include a disclaimer in its West Virginia advertising which reached Ohio or whether it was the result of Elby's prior legitimate use of the Big Boy symbol in Ohio, West Virginia and Pennsylvania.

## DEFENDANT'S EXPERT TESTIMONY

The Becker surveys and experiments and the Gallup survey were criticized by Elby's expert witness, Dr. Jacob Jacoby, a nationally recognized expert on consumer research. Most of the points made in his testimony were also developed in the cross examination of Becker and Wood and are reflected in the above discussion of their testimony.

Jacoby was asked to describe a market survey he would consider appropriate in this case. The question and his answer were as follows:

Q. If you were asked by me to do some market research to determine whether or not people are influenced by any misperceptions as to the affiliation of Elby's Family Restaurants with Big Boy or the availability of Big Boy double-deck hamburgers at Elby's Family Restaurants in Ohio, what would you do?

A. Well, first I would make sure that I spoke to the relevant people. If you are talking about influence to patronize, I would make sure I spoke with patrons and preferably patrons who patronize with a reasonable degree of frequency.

I would then provide them basically with a set of motivational factors and try to see which of those they would identify as having influenced their decision making to patronize that restaurant and purchase that particular type of food at a particular type restaurant.

Having defined the subset of influences they thought influenced them, I would have them put in priority order to see which from most to least influential.

Q. From that kind of study, you believe you could draw some conclusion as to behavior?

A. I think it would be much better basis for drawing conclusions as to what motivated their behavior, yes.

The court agrees that in this case it would have been helpful to have had some evidence as to whether or not confusion about the continued affiliation of the Elby's Ohio restaurants with the Big Boy chain was influencing consumer decisions. While evidence of confusion is highly relevant to the issue of injunctive relief, evidence that the confusion was actually influencing consumer decisions would be more germane to the issue of accounting in which the element of unjust enrichment is a key factor.

### 7. THE FRISCH'S—ELBY'S LITIGATION

On September 24, 1971, the month after Elby's terminated its Ohio Big Boy franchise, Frisch's counsel wrote to Elby's referring to prior correspondence which is not before the court. This letter specifically objected to the use of "Brawny Lad" and "other tradenames to which you are not entitled" and concluded with a demand that those items be deleted from the Elby's menus and that Elby's modify their units so that they do not in any way resemble a "Big Boy" operation.

In July of 1972, Frisch's filed suit against Elby's in the Circuit Court of Ohio County, West Virginia in a case entitled *Frisch's Restaurants, Inc. v. Elby's Fami-*

*ly Restaurant of Steubenville, Inc., et al.,* Civil Action No. 7505. This action sought recovery of franchise fees allegedly due under the sub-franchise agreements between Elby's and Frisch's and further alleged that Elby's was misleading the public to believe that its Ohio restaurants were operated under Big Boy franchises. The suit sought injunctive relief, an accounting and punitive damages. There was no specific reference to television or newspaper advertising in either the operative facts pleaded or the relief requested.

On August 1, 1973, after the Circuit Court declined to do so, the Supreme Court of Appeals of the State of West Virginia entered a temporary injunction against Elby's Family Restaurant of Steubenville, Inc., et al. enjoining them from using the registered trademarks "Big Boy" and "Brawny Lad" in any manner whatsoever in connection with their business operations within the State of Ohio.

On August 9, 1973, Mr. Roy Raskin, Director of the Franchise Division of Big Boy Restaurants of America, wrote to Mr. George Boury, Elby's Commissary, Inc., regarding the pending dispute between Elby's and Frisch's and specifically stated the objections of Big Boy Restaurants of America, a Division of Marriott, including, among others, the following:

"(d) The listing of your Ohio Elby's Family Restaurants on printed materials that also promote BIG BOY Restaurants, unless they are specifically identified as other than Big Boy Restaurants, rather than 'other locations' and, in general, promoting your Big Boy Restaurants unless it is made clear that your independent restaurants are not Big Boy Restaurants." See Plaintiff's Exhibit 48.

Marriott took no action against Elby's and there was no evidence that Marriott raised any further objections to Elby's operation or advertising of the Ohio restaurants after August, 1973.

There was no evidence that the plaintiff ever requested the West Virginia courts to specifically enjoin Elby's television and newspaper advertising or that it ever sought a contempt citation on the grounds that such advertising was a violation of the temporary injunction.

On July 8, 1977, Frisch's filed suit in this court in Case No. C-2-77-515, entitled *Frisch's Restaurant, Inc. v. Elby's Family Restaurant of Steubenville, Inc., et al.,* alleging that the defendants were passing off the Elby's double deck hamburger and steak sandwich when it received orders for "Big Boy" and "Brawny Lad" sandwiches at their Ohio restaurants. Frisch's sought injunctive relief against this activity and recovery of defendant's profits resulting from such alleged passing off. The complaint made no reference to television or newspaper advertising and sought no relief in regard thereto. The case was dismissed on the grounds that a similar action between the same parties was pending in the state court of West Virginia.

The present case was originally filed in the Common Pleas Court of Belmont County, Ohio, on November 27, 1978 and removed to this court on December 20, 1978. In its original complaint, Count 1, plaintiff alleged that Elby's termination of the Ohio franchise agreements was a breach of those agreements and sought judgment for fees and royalties allegedly due. In Count 2, Frisch's alleged that since July 30, 1971, "defendants have placed and continue to place advertisements in the Ohio and West Virginia media in which Elby's restaurants in both states are jointly promoted with the aid of the Big Boy trademark" and that "defendants in their advertisements and promotional campaigns make no effort to inform the public that Big Boy sandwiches are not available in Elby's restaurants located in the State of Ohio." Plaintiff alleged that defendant's actions and lack thereof constituted unfair competition and infringement of plaintiff's registered trademarks. Plaintiff sought injunctive relief and damages including defendant's profits, attorneys fees and liquidated damages as provided by franchise agreements.

On April 23, 1979 the Circuit Court of Ohio County, West Virginia stayed further proceedings in Civil Action No. 7505 pending final determination of the present action pending in this court.

On May 22, 1980, plaintiff's filed an amended complaint which described the WTRF reciprocal advertising agreement in detail and also specifically described the Elby's newspaper advertising in the Wheeling newspapers and its Yellow Pages advertising in the Ohio communities of Bellaire, Martins Ferry—Bridgeport and St. Clairsville. In this amended complaint, Frisch's also alleged a breach of the "patterned after" clause of the franchise agreements claiming that Elby's continued to use interior and exterior decor, supplies, paper goods, uniforms, menus and modes of operation patterned after Big Boy Restaurants located in Ohio, West Virginia, Pennsylvania and elsewhere.

On October 21, 1980, almost two years after the suit was filed, Frisch's moved for a preliminary injunction requesting that Elby's be enjoined from using the Big Boy trademark in any advertising medium that reaches "a not insubstantial number of Ohioans" without disclosing the disaffiliation of the Ohio restaurants from the Big Boy organization. On January 20, 1981, Judge Robert M. Duncan issued a preliminary injunction enjoining Elby's from using the Big Boy trademark and service mark in their WTRF advertisements without making a prominent disclosure that the Elby's restaurants in the State of Ohio are not associated with the Big Boy restaurant organization. Judge Duncan gave the defendants the option to eliminate all reference to Big Boy in the WTRF advertisements. He did not extend this preliminary injunction to Elby's newspaper and radio advertisements. See *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 514 F.Supp. 704 (S.D.Ohio 1981). Upon appeal, the United States Court of Appeals for the Sixth Circuit affirmed the granting of the preliminary injunction and further held that Frisch's was entitled to injunctive relief with respect to the newspaper advertising. See *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 651 (6th Cir.1982). It does not appear that after remand plaintiffs sought or that the court entered a preliminary injunction against the newspaper advertising as mandated by the Court of Appeals.

Upon the issuance of the preliminary injunction in January of 1981, Elby's stopped using any reference to Big Boy in its WTRF advertising. However, the Elby's ads in the Wheeling newspapers continued unchanged until March of 1983. George Boury testified that he was shocked to learn that this newspaper advertising had continued after the February 3, 1982 decision of the Sixth Circuit and Elby's produced evidence that this was due to a mistake which occurred in its advertising department. However the evidence also showed that each of the Boury brothers live in Wheeling and subscribe to the Wheeling papers. Presumably they read their own advertising.

On May 9, 1983, plaintiff filed a second amended complaint making claims similar to those asserted in *Frisch's v. Shoney's, supra*, alleging that Elby's had expended large sums of money advertising and promoting their Big Boy Restaurants and that as a result the Elby's name had become associated with the Big Boy Restaurant organization. Frisch's requested that the court enjoin the defendants from using the Elby's name in connection with the operation of restaurants in the State of Ohio. On January 16, 1987, defendants filed a motion to strike that portion of the prayer of the second amended complaint. Plaintiffs did not oppose the motion and it was granted by the Court.

In the final pretrial order filed herein on January 26, 1987, plaintiff did not include its "patterned after" claim among its statement of claims. It offered no evidence in support of that claim at the trial and the court finds that plaintiff has abandoned that claim.

In the course of the trial, plaintiff's counsel indicated that the prayer for injunctive relief was moot. Thus, the only claims remaining for the court's determination are the claims for damages based upon Elby's advertising activities following the 1971 termination of its franchise agreements with Frisch's.

## CONCLUSIONS OF LAW

The issue before the court at this time is whether Frisch's is entitled to an award of

monetary damages as a result of Elby's advertising in Eastern Ohio after August 1, 1971. Frisch's does not claim actual damages such as lost sales or profits, or damage to reputation or good will and made no attempt to prove any such damages. Instead Frisch's seeks an equitable accounting of all profits earned by those Ohio Elby's Family Restaurants which were the beneficiaries of the alleged improper advertising. Frisch's also seeks an award of liquidated damages in the amount of $100 per day and attorneys fees under the subfranchise agreement for the Steubenville, Ohio restaurant. Finally, Frisch's seeks an award of punitive damages and an award of attorneys fees under Section 35 of the Lanham Act, 15 U.S.C. § 1117.

Plaintiff seeks an accounting of profits under 15 U.S.C. § 1117 based on alleged violations of 15 U.S.C. § 1114 (registered trademark infringement) and § 1125 (statutory unfair competition). Judge Robert M. Duncan previously held that the plaintiff does have standing as an "assignee" to assert claims of registered trademark infringement under 15 U.S.C. § 1114. Defendants have requested this court to reconsider that ruling but it declines to do so.

The same remedies are available to the plaintiff under 15 U.S.C. § 1117 for either registered trademark infringement (15 U.S.C. § 1114) or statutory unfair competition (15 U.S.C. § 1125) See: *WSM Inc. v. Wheeler Media Services Inc.*, 810 F.2d 113, 1 USPQ 2d 1641 (6th Cir.1987); *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450 (11th Cir.1984).

15 U.S.C. § 1117 provides as follows: "Recovery for violation of rights; profits, damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court

shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Elby's use of the Big Boy trademark and tradename in advertising directed to the Eastern Ohio market after August 1, 1971 without disclosing that its Ohio restaurants were not Big Boy restaurants constituted registered trademark infringement under 15 U.S.C. § 1114. A licensee's use of a licensed mark after expiration of the license agreement constitutes trademark infringement. See: *Holiday Inns Inc. v. Airport Holiday Corporation*, 493 F.Supp. 1025 (N.D.Tex.1980) aff'd *Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 (5th Cir.1982).

Elby's use of the Big Boy trademark and tradename in advertising directed to the Eastern Ohio market after August 1, 1971 also constituted a violation of 15 U.S.C. § 1125, statutory unfair competition. Elby's advertising created a "false designation of origin" or a "false description or representation" of their goods by creating the impression that the Ohio restaurants were also affiliated with the Big Boy organization. This constituted a violation of Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). See: *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir.1963).

On the basis of these violations plaintiff would clearly have been entitled to final injunctive relief making permanent the injunctions previously issued by Judge Duncan and mandated by the Court of Appeals. However, the evidence showed that Elby's completely disaffiliated itself from the Big Boy organization in 1984, that it discontinued the offending television advertising in 1981 and the newspaper advertising in 1983 and has no intention or desire to use the Big Boy trademark or tradename in any future advertising. On this basis, the plaintiff concedes that its request for injunctive relief is moot.

These violations however do not automatically entitle the plaintiff to an accounting and award of defendants' profits. 15 U.S.C. § 1117 specifically provides that the remedies it provides, which include recovery of defendant's profits, are "subject to the principles of equity" and further provides that "such sum ... shall constitute compensation and not a penalty".

"This does not mean that a successful plaintiff is entitled in all cases to a monetary award in addition to injunctive relief. The award for damages is 'subject to the principles of equity'. Relief is properly denied 'where an injunction will satisfy the equities of the case' ... *Carl Zeis Stiftung v. Veb Carl Zeis Jena*, 433 F.2d 686 (2d Cir.1970) at pp. 706, 707.

The courts have expressed two views of the circumstances in which an accounting is proper under 15 U.S.C. § 1117. Some limit the award of an accounting to cases in which it will serve the purpose of compensating a mark holder for lost or diverted sales. Others view an accounting not just as compensation for lost or diverted sales but as redress for the defendant's unjust enrichment and as a deterrent to further infringement. See: *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir.) *cert. denied* 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968) and *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 584 (5th Cir.1980).

■ This court concludes that under the current state of the law an accounting under Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)) is appropriate in three situations: (1) if the plaintiff sustained damage from the infringement, (2) if the infringer is unjustly enriched, and (3) if necessary to deter a willful infringer from doing so again.

■ The decision of the court of appeals in *Nalpac Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir.1986) provides further guidance as to the factors which justify an accounting. Infringement alone is not enough. There must be a deliberate attempt to cause confusion, mistake or to deceive purchasers. Bad faith must be shown. An accounting is inappropriate where there has been no showing of fraud or palming off. These rules apply to cases in which a plaintiff has not shown actual damage.

■ In this case, plaintiff concedes that it sustained no actual damage from the infringement by way of lost sales or profits. Plaintiff had no restaurants within the coverage of the offending advertisements and was not a competitor of the defendant in that market area. Thus in this case, there is no basis for an accounting to compensate plaintiff for lost profits.

After considering all of the evidence, the court is not persuaded that the defendants were unjustly enriched as a result of their improper advertising activities. There was no evidence whatsoever of any financial gain accruing to the defendants as a result of their failure to include in their advertising a disclaimer to the effect that their Ohio restaurants were not affiliated with the Big Boy chain. There was no evidence that any confusion caused by this advertising actually resulted in increased sales or profits to the defendants. Indeed the evidence shows that from 1971 when the Ohio Big Boy franchises were cancelled until 1984 when defendants completely disaffiliated themselves from the Big Boy chain, they were engaged in a program of de-emphasis of the Big Boy trademark and tradename, not wishing to be identified as a hamburger restaurant or to be engaged in the "hamburger wars" with such national chains as McDonald's, Wendy's, and Burg-

er King. They chose instead to develop and emphasize their own tradename Elby's, their own red hexagonal symbol and their own pattern of operation and reputation as a "sit down" family restaurant.

Nor is this case one in which an accounting should be granted in order to deter a willful infringer from further infringement. The conduct of the defendants in this case is not of the same kind and character as that which seems to characterize those cases in which an accounting has been allowed for this purpose. See: *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389 (2d Cir.1965) and *W.E. Bassett v. Revlon, Inc.*, 435 F.2d 656 (2d Cir.1970). These defendants do not have a history of unethical business practices related to unfair competition or trademark infringement. They are responsible businessmen who operate a high quality chain of family restaurants. There is no suggestion, indeed there appears to be no possibility, that they would ever engage in any future activities which would in any way involve an association with the plaintiff's trademark and tradename. In short, there is nothing in this case which would suggest that an accounting should be awarded in order to deter these defendants from a further violation of plaintiff's rights.

Considering all of the facts and circumstances of this case, the court finds that plaintiffs have failed to show that the defendants were guilty of bad faith, or that they acted with the deliberate intent to cause confusion, mistake or to deceive purchasers or to purposely palm off their goods as those of the plaintiffs.

Defendants had the right to use the Big Boy name and trademark in advertising their West Virginia and Pennsylvania restaurants. They paid substantial franchise fees to the Marriott Corporation for the right to do so until August, 1984. Defendants not only had the right, but under their agreements with Marriott, the duty, to promote the Big Boy trademark and tradename in Pennsylvania and West Virginia. After cancelling their sub-franchise agreements with Frisch's in 1971, the defendants conscientiously refrained from using the Big Boy trademark and tradename at their Ohio restaurants and in their newspaper and television advertising which originated in Ohio. They established a system to guard against mistakes which included color coded ad insertion orders.

Defendants failed to put a disclaimer in their West Virginia television and newspaper advertising to the effect that their Ohio restaurants were not affiliated with the Big Boy chain, but the court believes this omission was not motivated by an intent to deceive, but resulted instead from a good faith belief that under the circumstances it was not required. It is understandable that an advertiser would be reluctant to include a potentially distracting message in a carefully designed, highly condensed and expensive advertisement. The fact that after this court's January, 1981 injunction defendants chose to eliminate all reference to Big Boy suggests that the failure to include a disclaimer in the earlier advertising was more likely the result of these considerations than an intention to improperly link the Ohio restaurants to the Big Boy chain.

The WTRF reciprocal advertising agreement was not conceived for the purpose of improperly linking the Ohio restaurants to the Big Boy chain but as a device to exchange Elby's promotion of WTRF for free television time. The Ohio restaurants were included primarily because the more locations at which Elby's promoted WTRF the more free air time it received.

The nature of the advertising itself is not consistent with a pattern of willful infringement. If it was the defendants' intention to improperly associate its Ohio restaurants with the Big Boy chain through the medium of its West Virginia television and newspaper advertising, it is difficult to understand why many of the commercials made little or no use of the Big Boy name or symbol. In this connection, it is significant that the use of the Big Boy tradename in these commercials substantially decreased after Elby's acquired the ability to produce its own television commercials in

house, as opposed to using tapes supplied by Marriott.

Plaintiff's failure to object to the West Virginia advertising for over seven years also plays a role in the court's decision. There is no evidence that plaintiff ever specifically objected to the WTRF television advertising campaign or the Wheeling newspaper advertisements until the present law suit was filed in November, 1978. The initial litigation between these parties, which began in the courts of West Virginia, was based on allegations that although defendants had discontinued the use of the Big Boy trademark and tradename at their Ohio restaurants they continued to maintain "the image of operating under a Big Boy franchise" by continuing the former appearance menu and methods of operation. Although plaintiff obtained an injunction from the highest court of the State of West Virginia, there is no indication that plaintiff ever asked that court to enjoin defendants' television and newspaper advertising in Wheeling or that it ever suggested to that court that such advertising violated the terms of its injunction. This undoubtedly lulled the defendants into a sense of security regarding that advertising and is yet another factor in this court's determination that the defendants were not guilty of bad faith.

This court is mindful of the fact that its predecessor found that the defendants' infringement was intentional and that this finding was affirmed by the court of appeals. However, this court has now had the benefit of hearing all of the evidence relevant to the issues raised in this case and this court concludes that the defendants' actions were not willful, malicious or fraudulent.

Under Section 35(a) of the Lanham Act, this court's authority to award an accounting is specifically subject to the principles of equity. In view of all of the facts and circumstances of this case, this court concludes that equity would not be served by an order which deprived the defendants of all of the profits of their Eastern Ohio operations over a period of thirteen years or more.

■ An equitable accounting of profits is not recoverable under the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*, which has no provision for an accounting of profits and did not include a provision for damages at the time this action was commenced.

■ Plaintiff seeks recovery of liquidated damages and attorneys fees pursuant to the terms of the franchise agreement for the Steubenville, Ohio restaurant. This agreement requires that upon termination the licensee shall discontinue the use of the Big Boy tradename and provides for liquidated damages of $100 per day in the event the licensee continues such use after written demand from the licensor. Whether this agreement can be fairly read to cover the circumstances of this case is doubtful. However, it is not necessary to reach that question since the evidence did not reveal that the written demand necessary to invoke the agreement was ever made by the plaintiff. In asserting this claim plaintiff relies on a letter of its counsel dated September 24, 1971 which reads as follows:

Gentlemen:

We cannot understand why you have not replied to our letter of August 13th. We also wish to point out that you have not made the payments which Mr. Ullman estimated to be due as per his letter of August 31, 1971.

We notice your change in menus but do not understand why you continue to use "Brawny Lad" and other trade names to which you are not entitled.

We must insist that you immediately delete these items from your menus and modify your units so that they do not in any way resemble a "Big Boy" operation. (Plaintiff's Exhibit 90).

This letter does not mention the Elby's advertising and is not sufficient to trigger liability for liquidated damages or attorneys fees with respect to that activity.

■ Plaintiff claims attorneys fees under 15 U.S.C. § 1117 which provides for such an award in "exceptional cases". Here the lack of actual injury to the plain-

tiff and the absence of elements of malicious, willful or fraudulent conduct leads to the conclusion that this case is not exceptional within the meaning of the statute. See: *Hindu Incense v. Meadows*, 692 F.2d 1048 (6th Cir.1982).

■ Plaintiff is not entitled to recover punitive damages. Neither the Lanham Act nor the Ohio Deceptive Trade Practices Act provides for such an award. In any event, defendants' conduct does not rise to the level necessary to justify such an award.

Defendants assert the defense of laches to the claim for equitable accounting. The courts have recognized a distinction in applying this defense to a claim for an injunction as opposed to a claim for damages. In the former case the defense rarely succeeds but it is not so reluctantly applied to damage claims. See: *University of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044–1045 (3rd Cir.1982).

Although this court's predecessor rejected the defense of laches when considering the issue of injunctive relief, this court finds that the defense should be applied to the claim for equitable accounting.

■ The two essential elements of the defense are (1) inexcusable delay in instituting suit, and (2) prejudice to the defendant resulting from such delay.

■ Here, the plaintiff delayed over seven years in bringing suit on the basis of Elby's advertising activities.

The only evidence of any written objection or demand from Frisch's to Elby's after the August 1, 1971 termination of the Ohio franchise agreements was the September 24, 1971 letter from Frisch's counsel quoted above. It made no reference to Elby's advertising. The lawsuit filed in the West Virginia state court in 1972 made no reference to the advertising, nor did the 1977 lawsuit filed in this court. The only evidence tending to show that Elby's was put on notice that its West Virginia advertising was improper was the August 9, 1973 letter from Marriott. This was a two page letter in which the primary subjects were the similarity of the appearance and

operation of the Ohio and West Virginia restaurants and their menus and the listing of the Ohio restaurants on printed material promoting Elby's Big Boy restaurants. Television and newspaper advertising was not specifically mentioned. The letter was not from Frisch's.

Frisch's offered no evidence explaining why it did not ask the West Virginia court to enjoin the advertising on WTRF and in the Wheeling newspapers or why it never asked that court to sanction Elby's on the grounds that that advertising violated the injunction which was in force for over five years before the present lawsuit was filed in this court.

While there was no direct evidence as to when Frisch's became aware of the Wheeling, West Virginia newspaper and television advertising there is evidence from which notice can be inferred. In November, 1972, Frisch's assigned Richard Metcalf of its marketing department to investigate Elby's activities in Eastern Ohio. In the process, he visited all three Ohio restaurants. He would have seen the billboards and paper goods tied in to the WTRF advertising. When Frisch's filed suit against Elby's in the state court of West Virginia, it was represented by Wheeling, West Virginia counsel. Elby's advertising activities on WTRF and in the Wheeling papers could hardly have escaped notice.

Plaintiff offered no excuse for or explanation of its delay in bringing action on the basis of the Elby advertising activities. The court finds that in the context of an action which seeks to require the defendants to forfeit all of the profits of their Ohio operations for a period of thirteen years or more, such delay is inexcusable. The nature of the claim itself satisfies the requirement that the delay result in prejudice to the defendant. Each year that Elby's continued its advertising in the absence of objection by Frisch's increased the amount of damages Frisch's could claim through equitable accounting.

## JUDGEMENT

The clerk shall enter final judgment in favor of the defendants, however, since

plaintiff was successful in its claim for injunctive relief the costs of this action are assessed against the defendants.